BARNES, J.,
 

 for the Court:
 

 ¶ 1. The Chancery Court of Jones County granted Michael and Sarah Phillips a divorce on the ground of irreconcilable differences. Michael appeals the chancery court’s custody determination regarding the parties’ two children and division of certain marital assets and liabilities. Regarding child custody, Michael claims the chancellor: (1) failed to make on-the-record findings as to why the eldest child’s preference should not be honored and (2) erred in awarding joint legal and physical custody to the parties. Regarding the distribution of the parties’ assets and debts, he claims the chancellor erred in (1) not taking into consideration Sarah’s alleged misconduct during the marriage, (2) not enforcing the parties’ “pre-separation agreement” concerning the disposition of certain real property, and (3) failing to properly classify and equitably divide certain debts of the parties. Finding no error, we affirm.
 

 STATEMENT OF FACTS AND PROCEDURAL HISTORY
 

 ¶ 2. Michael and Sarah married in 1984. Two daughters were born of the marriage: Shayla and Samantha, who, at the time of
 
 *688
 
 trial, were fourteen and ten years old, respectively. In 1989, the parties moved to a house then owned by Sarah’s grandparents on Duck Hill Road in Soso, Mississippi. In 1996, the parties bought 10.4 acres on Union Line Road in Soso, and lived in an old homestead until Michael completed the building of the new marital home on the property in 2001. The parties financed the construction of the new house through Trustmark National Bank. Later, they bought another five acres which adjoins the 10.4 acres, which was financed through the Bank of Jones County, which initially held a lien on both tracts of land, excluding the house and one acre. Also, the parties purchased a one-half-acre strip of land separate from their homestead property for $800, which adjoins property owned by Sarah’s parents.
 

 ¶ 3. In November 2005, Michael approached Sarah about an exchange of quitclaim deeds on a portion of their property after he claimed that she had refused to pay the family’s bills and that creditors were harassing him. Michael stated that they agreed each person would be responsible for his or her own bills. Michael claims Sarah did not want anything to do with the property at issue. Therefore, they agreed Sarah would deed the 10.4 acre and five-acre parcels of land to him, excluding the house and one acre. In return, Sarah would receive a one-third interest in the one-half acre strip of land, jointly deeded to her and her two children. Michael would assume responsibility for the loan at the Bank of Jones County, and Sarah’s name would be taken off this note. At the time, the note had a balance of $12,201.65. The parties would i-etain joint ownership of the marital homestead and one acre. Michael had an attorney draw up the quitclaim deeds, and Sarah eventually signed them.
 

 ¶ 4. During the course of the marriage, the parties separated several times. Michael admitted that once the children were born, he left them with Sarah whenever the couple separated. Also, Michael stipulated to an affair with a woman from 1995 to 1996, but Sarah subsequently condoned his adultery. In March 2006, however, Sarah and Michael permanently separated. Sarah moved back into the Duck Hill home, which her parents now owned, and Michael stayed at the Union Line home. On this property, he has a shop related to his construction business which he built with the original proceeds from the loan with the Bank of Jones County.
 

 ¶ 5. In January 2007, Michael filed for a divorce in the Jones County Chancery Court under the ground of habitual, cruel and inhuman treatment or, in the alternative, irreconcilable differences. He requested custody of the two children, child support, and ownership of the Union Line marital home. In March 2007, the chancellor executed a temporary order granting temporary physical custody of the children to Michael on the weekdays and to Sarah on the weekends. Michael was also granted temporary use and possession of the Union Line homestead.
 

 ¶ 6. In June 2007, Sarah’s counsel sent a letter to Michael’s counsel stating her refusal to agree to an irreconcilable differences divorce, and that Michael would have to prove a ground for divorce. Therefore, Michael hired private investigators, who had Sarah under surveillance for several days in September. The investigators testified at trial that Sarah was seen in the company of a man with whom Michael suspected she was having an affair. At trial, Sarah admitted to having sexual relations with this man after she had separated from Michael; however, she denied having sexual relations with any man prior to the separation.
 

 
 *689
 
 ¶ 7. At the end of September 2007, Michael amended his complaint for divorce to allege adultery. In October 2007, the parties agreed to an irreconcilable differences divorce. A two-day trial was held in March and April 2008 on the matters of child custody and property distribution.
 

 ¶ 8. Testimony revealed both parties held a variety of jobs during the course of the marriage and made similar incomes. From 1990 to 1999, Michael entered into a series of businesses, including diesel repair, a “quick stop,” and mobile home repairs. Some businesses were not successful. Since November 2007, Michael had been working for his brother in the construction business. For most of the marriage, Sarah worked outside of the home for various employers. For the past nine years, she has worked at Wayne Farms in Laurel, Mississippi as a payroll clerk. Sarah provides for the children’s health and dental insurance through her employer. During the marriage, she was usually responsible for paying the parties’ bills. Sarah testified that many of Michael’s business ventures were not profitable or failed; therefore, the family had to rely solely on her income.
 

 ¶ 9. Regarding child custody, Shayla, the eldest child, who was fourteen at the time, testified that she preferred living with her father during the week and her mother during the weekend. She found her father’s home “safer” than her mother’s, and the heat in her bedroom at her mother’s home inadequate. Additionally, at her mother’s home, Shayla complained that everyone shares a bathroom, and that she and her sister share a bedroom. However, at her father’s home, the girls have then-own bedrooms and bathrooms. Shayla also stated that they have a better daily routine at their father’s house. Additionally, Shayla mentioned some incidents which made her feel uncomfortable under her mother’s care. She testified that once she and her mother and sister got into an argument, and Shayla sustained a small bruise where her maternal grandfather grabbed her wrist. Another time, she stated her mother drank half a beer while driving her to a football game.
 

 ¶ 10. Michael stated that he desired primary custody of both children during the week, with Sarah having visitation during the weekends. He testified Sarah takes the girls to school, and in the afternoon, Sarah either picks the girls up or they ride the bus and are taken to the home of Michael’s parents, which is five miles from his Union Line home. He stated Sarah mostly takes the girls to their after-school activities, such as softball, T-ball, basketball, or cheerleading; however, he attempts to attend the various games and activities when he was not working. He was the children’s “disciplinarian.” Because of his parents’ involvement in the children’s lives after school, he took credit for eighty percent of the children’s care. Michael claimed to have a more stable routine for the children, a more flexible work schedule, and a better home than Sarah. He noted the Union Line home is much larger than Sarah’s Duck Hill residence. Further, Michael complained of the “environment” and “atmosphere” of the Duck Hill home, which is in a historically African American area of Soso. Michael also testified that Sarah has “bad parenting skills” because she drinks alcohol around the children, and he does not.
 

 ¶ 11. Sarah testified that she desires primary custody or, in the alternative, joint legal and physical custody. If she were granted only weekend custody, she noted she would have less time with the girls, because they were at an age where they were engaging in social activities on the weekend. Sarah contends her employment hours are from 7:30 a.m. to 4:40 p.m.,
 
 *690
 
 but flexible for child care. Her supervisor corroborated these facts. She has days off for family emergencies. Prior to the separation, Sarah estimated that Michael had had two affairs, while she was faithful until after the separation. She claims since separation, Michael has been in a relationship with another woman, who has spent time around the children. While the residence at Union Line is newer and larger, Sarah denied the Duck Hill home is in an unsafe neighborhood. In fact, it is the home she grew up in and where the parties started their family at the beginning of their marriage. Sarah maintains her home has adequate heat. She felt that since her daughters are near the age of puberty, they need their mother. Regarding the incident of driving and drinking beer which Shayla mentioned, Sarah explained that she had had a bad day and had poured half of a beer in a cup, but she only drank half of that, while taking Shayla to a ballgame. She has never received a DUI, and stated she does not normally drink around the children. Evidence showed Sarah did most of the housework for the family and was “the nurturer.” At trial, several relatives and friends testified to the fact both Michael and Sarah were good parents.
 

 ¶ 12. Additionally, there was a great deal of testimony regarding the parties’ assets and debts. The marital home on Union Line Road and one acre was appraised at $157,500. The surrounding 10.4 and five acres of “raw land” were appraised at $62,500. At the time of trial, the parties owed $92,875.15 on their mortgage note with Trustmark National Bank and $14,767.10 on a loan from the Bank of Jones County for the 10.4 acres and five acres surrounding the marital homestead.
 
 [1]
 
 Michael requests ownership of the 10.4 and five acres, the marital home, and the one acre upon which the home is situated.
 

 ¶ 13. Michael borrowed $20,000 from the Bank of Jones County shortly after the parties separated in April 2006 for family bills. Michael also claimed that Sarah had charged a great deal on his credit card before their separation. Sarah denied this claim. The credit card’s balance was approximately $12,000. However, after six months of working with the credit card company, Michael “settled it out” for $3,800. The parties also borrowed $15,000 from Michael’s parents in April 2003 to pay family bills, signing a promissory note to that effect, which was entered into evidence. Both parties admitted the note is still unpaid; there was no proof of payments after November 2004. Michael also testified that the parties borrowed an additional $25,000 from his parents over the course of the marriage for bills and home improvements, but the only proof of debt presented was the $15,000 promissory note. Sarah stated she also borrowed money from her parents, but again, no proof was entered into evidence.
 

 ¶ 14. Regarding the quitclaim deeds executed in November 2005, Michael denied that Sarah was coerced into signing the deeds. He states, and Sarah concurs, that an attorney was hired to represent them both in the transaction, and Sarah voluntarily went to the attorney’s office to execute the deeds. However, Sarah testified that she signed them because “he told me to sign it” and to “get [Michael] off [her] back.” At the time, she did not understand why they were splitting up the property, but she felt that by signing the deeds, she was saving her marriage.
 

 
 *691
 
 ¶ 15. In April 2008, the chancellor issued an opinion analyzing the factors for child custody and property distribution. Regarding the quitclaim deeds, the chancellor found that Michael was anticipating the divorce, and his intent was to put himself at an advantage over Sarah regarding the division of the marital assets. Accordingly, the chancellor found all of the real property in the deeds, excluding the half-acre strip of land, marital property, and he awarded Sarah an undivided fifty-percent share in this property and the marital home. Regarding the $15,000 debt to Michael’s parents, the chancellor found no evidence that there was an actual promissory note that set up a payment plan or obliged either spouse to make payments; therefore, it was not a marital debt. Additionally, he ruled that the statute of limitations had run on the collection of the debt.
 
 [2]
 

 ¶ 16. In May 2008, the court entered a judgment granting the parties a divorce based on irreconcilable differences. Because of the similarity in the parties’ incomes, no child support or alimony was awarded. The chancellor granted the parties joint legal and physical custody of the two minor children, with the parents alternating physical custody on a week-to-week basis. The court determined the value of the Phillipses’ marital property to be $220,000. This figure included the appraisal value of the marital homestead and one acre ($157,500), and the 10.4 acre and five acre tracts of land surrounding the homestead ($62,500). The chancellor deducted the following debts from the value of the marital property: the balance on the Trustmark National Bank mortgage on the home in the amount of $90,875.15; the note with the Bank of Jones County in the amount of $14,767.10; and credit-card debt in the amount of $8,800, resulting in $110,557.75 in equity for the marital property. The chancellor ordered Michael to purchase Sarah’s one-half interest in the marital property’s equity, or $55,278.88, within thirty days; otherwise, the parties were to sell the property. The court also awarded Michael one-half of the value, at the time of separation, of Sarah’s 401k retirement account with Wayne Farms, and ordered Michael to reimburse Sarah for one-half of the children’s health and dental insurance premiums, as long as she provided their medical and dental insurance through her employer.
 

 ¶ 17. Michael filed a motion to reconsider the chancellor’s judgment, for a new trial, or to alter and amend the judgment. He argued for sole custody of the two children and denied he had defrauded Sarah by having her sign the quitclaim deeds. Further, he argued that the $15,000 debt owed to Michael’s parents was a valid debt, and Sarah should pay half of it. Michael also moved to reopen the evidence regarding custody, as the younger daughter did not testify about her parental preference for custody.
 

 ¶ 18. In June 2008, the chancellor granted Michael’s request to open the evidence solely on the custody issues, as the court became aware that Michael had contacted the Department of Human Services (DHS), alleging Sarah had committed child abuse. Additionally, the court ruled that the $15,000 debt to Michael’s parents was valid, and Sarah would be responsible for half of it.
 

 ¶ 19. In September 2008, a hearing was held on the custody issues that had occurred since the trial, which consisted of Michael’s calling DHS about two incidents
 
 *692
 
 involving Shayla while under Sarah’s care. In the first incident, Shayla and Samantha had a disagreement; Sarah grabbed Shay-la to stop the fight, and Sarah and Shayla fell to the floor. Shayla described the incident as a “fight” between her and her mother. Sarah, however, denied any allegations of abuse to either daughter. Photographs were entered into evidence of Shayla’s knee, which was bruised.
 

 ¶ 20. ■ In the second incident, Shayla testified that while at her mother’s home, her maternal grandfather, who lived across the street, pulled down his shorts and exposed his naked buttocks. Shayla claimed that both she and her sister were very upset by the incident. Shayla’s maternal grandmother (Sarah’s mother and the grandfather’s wife) witnessed the event, and testified that Shayla and her grandfather had been joking about the warm weather when the grandfather pulled down his shorts. She stated that the grandfather was joking, and Shayla was not emotionally upset. In response to the incident, Shayla had laughed at her grandfather. However, the grandmother admitted that her husband’s actions were inappropriate; and he did apologize to Shayla. Sarah stated that Shayla and her grandfather were “picking back and forth.” The grandfather declined to testify about any details of the incident, as criminal charges were pending in justice court. A DHS investigative report was admitted into evidence for both incidents. It found no evidence of emotional abuse, neglect, or physical abuse by Sarah.
 

 ¶ 21. The chancellor entered a final order in November 2008, recalculating the debts deducted from the appraised values to include a sum of $12,201.65, which represents the amount the court found as marital debt out of the second loan Michael borrowed from the Bank of Jones County in the amount of $20,000. In December 2008, the court held a hearing on Sarah’s complaint for citation for contempt, in which she stated that Michael was not requiring the children to obey the custody order. At the hearing, Sarah testified that the children were only coming to her residence on the weekends, in spite of the chancellor’s week-to-week custody order. Shayla refused to stay with Sarah during the week. Also, Michael cooperates with the children’s request to be picked up from their mother’s home early. The chancellor considered several options from youth court proceedings to counseling for Shayla and Samantha, and ultimately he recommended family counseling to resolve the conflict.
 

 ¶ 22. Michael timely filed his notice of appeal.
 

 STANDARD OF REVIEW
 

 ¶ 23. This Court’s standard of review in domestic relations matters is extremely limited. The findings of the chancellor will not be disturbed unless the chancellor was “manifestly wrong, clearly erroneous or an erroneous legal standard was applied.”
 
 Perkins v. Perkins,
 
 787 So.2d 1256, 1260-61 (¶ 9) (Miss.2001) (quoting
 
 Montgomery v. Montgomery,
 
 759 So.2d 1238, 1240 (¶ 5) (Miss.2000)). Further, the chancellor’s findings of fact will not be reversed where there is substantial evidence supporting those findings.
 
 Floyd v. Floyd,
 
 949 So.2d 26, 28 (¶ 5) (Miss.2007) (citing
 
 Cooper v. Crabb,
 
 587 So.2d 236, 239 (Miss.1991)).
 

 ANALYSIS OF THE ISSUES
 

 1. Child Custody
 

 ¶ 24. Michael raises two issues regarding child custody. He contends that the chancellor failed to make on-the-record findings as to why Shayla’s preference was not honored and that awarding custody on
 
 *693
 
 an alternating basis was not in the best interests of the children. Therefore, Michael concludes that the chancellor erred in awarding joint legal and physical custody.
 

 ¶ 25. In child custody matters, “the polestar consideration ... is the best interest and welfare of the child.”
 
 Albright v. Albright,
 
 437 So.2d 1003, 1005 (Miss.1983). Factors the chancellor must consider when determining the child’s best interest are:
 

 (1) the age, health, and sex of the child; (2) a determination of the parent who had the continuity of care prior to the separation; (3) which parent has the best parenting skills and which has the willingness and capacity to provide primary childcare; (4) the employment of the parent and the responsibilities of that employment; (5) the physical and mental health and age of the parents; (6) the emotional ties of parent and child; (7) moral fitness of the parents; (8) the home, school, and community record of the child; (9) the preference of the child at the age sufficient to express a preference by law; (10) the stability of the home environment; and (11) other factors relevant to the parent-child relationship.
 

 Benal v. Benal,
 
 22 So.3d 369, 372 (¶ 5) (Miss.Ct.App.2009) (citing
 
 Albright,
 
 437 So.2d at 1005). The chancellor found two
 
 Albright
 
 factors favored Sarah: the age, health and sex of the children and her continuity of care prior to separation. According to the opinion of the court, the chancellor took into account Shayla’s preference for Michael, and noted Samantha was not old enough to testify as to a preference. The other remaining factors were all found to be neutral. The chancellor concluded that joint custody would be in the best interest of the children, alternating weeks with each parent.
 

 a. Shayla’s Preference
 

 ¶ 26. Michael argues that Shay-la’s preference was not taken into account by the chancellor when she testified at trial that she would prefer to live with her father, and the chancellor erred in not making an on-the-record finding as to why her preference was not honored. Since the temporary custody order of March 2007 until the trial one year later, the children had been staying with their father during the week and their mother during the weekend. Shayla stated her preference was to continue this schedule. Before the temporary order, Shayla acknowledged that they had tried various custody arrangements, and this one seemed to work the best.
 

 ¶ 27. The applicable statute, Mississippi Code Annotated section 93-ll-65(l)(a) (Supp.2006), states “the chancellor
 
 may consider
 
 the preference of a child of twelve (12) years of age or older as to the parent with whom the child would prefer to live in determining what would be in the best interest and welfare of the child. The chancellor shall place on the record the reason or reasons for which the award of custody was made and explain in detail why the wishes of any child were or were not honored.”
 
 Id.
 
 (Emphasis added.)
 

 f 28. We note section 93-11-65 was amended in 2006, weakening the power of a child’s preference in custody determination. Before this amendment, a child over the age of twelve had the “privilege” of choosing which parent to live with, as long as both parents were fit and it correlated with the best interest of the child, instead of merely being able to express that preference, as the statute currently reads.
 
 See
 
 Miss.Code Ann. § 93-11-65 (Rev.2004). We also note Michael only cites to cases which deal with the old version of the statute before it was amend
 
 *694
 
 ed. However, even before the 2006 amendment, the child’s preference was but one factor which was considered for custody purposes.
 
 Brown v. Brown,
 
 764 So.2d 502, 505 (¶ 8) (Miss.Ct.App.2000) (quoting
 
 Westbrook v. Oglesbee,
 
 606 So.2d 1142, 1147 (Miss.1992)). The child’s preference is not outcome determinative.
 
 Holmes v. Holmes,
 
 958 So.2d 844, 848 (¶ 15) (Miss.Ct.App.2007). Further, the trial court is not obligated to follow the child’s stated preference.
 
 Anderson v. Anderson,
 
 961 So.2d 55, 58-59 (¶ 7) (Miss.Ct.App.2007) (citing
 
 D.A.P. v. C.A.P.R.,
 
 918 So.2d 809, 824 (¶62) (Miss.Ct.App.2005)). The ultimate issue is the best interest of the child.
 
 Id.
 

 ¶29. Shayla was fourteen years old at the time of trial; her sister Samantha was ten years old. Accordingly, Shay-la was allowed to testify as to her custodial preference; Samantha was not. In his opinion, the chancellor clearly took into account Shayla’s preference to live with her father. The chancellor has broad discretion to determine the best interest of the child after all of the evidence is presented. We find no error in this regard.
 

 ¶ 30. As far as Michael’s contention that the chancellor erred in not providing a detailed explanation as to why Shayla’s preference was not honored, we cannot say from the record that her preference was not honored. According to his analysis of the
 
 Albright
 
 factors, the chancellor found more factors favored Sarah than Michael; so the chancellor could have granted Sarah primary legal and physical custody of the children with Michael receiving only weekend visitation. Instead, he granted the parents joint custody, finding it in the best interests of the children to spend equal time with both parents. Further, even if the judgment is interpreted as not honoring Shayla’s preference because Michael was not awarded primary custody, the chancellor explained his reasoning when he stated:
 

 This appears to be a classic case in which the Court should consider — and does consider — an award of joint physical custody of these children. They need both their parents in their lives. At this point in time, I think the better thing to do for them and what would be in their best interest would be to provide for a joint physical custody arrangement where they would be with their father for a week and be with their mother for a week.
 

 ¶ 31. Michael cites to
 
 Polk v. Polk,
 
 589 So.2d 123 (Miss.1991) to support his contentions. In
 
 Polk,
 
 the supreme court held the chancellor erroneously denied the child’s custodial preference without an explanation on the record.
 
 Id.
 
 at 130. The supreme court reversed the case for further consideration of this matter, as well as others.
 
 Id.
 
 at 124.
 
 Polk,
 
 however, dealt with a modification of child custody and was based on the pre-amendment section 93-11-65, which gave children twelve years of age and older the stronger privilege of choosing their custodial parent. We find no case law based on the current statute where the chancellor’s custodial ruling has been reversed for failure to give a detailed explanation on the record. Accordingly, we find no error.
 

 b. Joint Physical Custody on an Alternating Basis
 

 ¶ 32. Michael contends that awarding joint physical custody on an alternating basis each week is not in the best interests of the children. He also notes the chancellor’s opinion did not reference certain specific facts, such as: Michael has a nicer home for the children; Sarah lives across the street from her father (the children’s maternal grandfather), who pulled his pants down in front of Shayla; both Sarah and the maternal
 
 *695
 
 grandfather have physically grabbed and pushed Shayla; and Sarah drove while drinking beer with the children in the car on one occasion. Michael also states the chancellor erred in finding the
 
 Albright
 
 factor of moral fitness of the parents neutral since there was no evidence Michael had had an affair once the parties separate ed, but there was evidence that Sarah had had an affair post-separation.
 

 ¶ 33. Although neither party addresses this issue specifically, we must first address whether it was proper for the chancellor to award joint custody in an irreconcilable differences divorce. Mississippi Code Annotated section 93-5-24(2) (Rev.2004) allows the award of joint custody in the case of an irreconcilable differences divorce, at the discretion of the chancellor, “upon application of both parents.” Michael states that neither party requested joint physical custody. However, this is incorrect. At trial, Sarah testified that she desired primary custody or, in the alternative, joint custody. Further, we find Michael did not need to request joint custody in order for the chancellor to award it. Recently, in
 
 Crider v. Crider,
 
 904 So.2d 142, 146-47 (¶¶8-11) (Miss.2005), the supreme court held that the phrase “upon application of both parents” in section 93-5-24(2) can have more than one interpretation because of the history of divorce and custody statutes. The
 
 Crider
 
 court held that it is logical that when both parties consent for the court to determine custody, they fulfill the “application of both parents” requirement of section 93-5-24(2).
 
 Id.
 
 at 147 (¶ 12). “[T]he fact that the parties request that the court determine which parent is to receive ‘primary custody does not alter this.”
 
 Id.
 
 The supreme court concluded that the statute should be interpreted to allow the chancellor to award joint custody in an irreconcilable differences divorce if it is in the best interest of the child.
 
 Id.
 
 at 148 (¶ 16). Therefore, it was proper for the chancellor to consider and award joint custody here, even though Michael did not request it.
 

 ¶ 34. That said, we note that
 
 Crider
 
 stresses that the chancellor should
 
 not
 
 award joint custody unless the parents are capable of sharing joint custody cooperatively.
 
 Id.
 
 at 147 (¶ 13). Mississippi Code Annotated section 93-5-24(5) (Rev. 2004) explains: “[a]n award of joint physical and legal custody obligates the parties to exchange information concerning the health, education and welfare of the minor child, and unless allocated, apportioned or decreed, the parents or parties shall confer with one another in the exercise of decision-making rights, responsibilities and authority.” The chancellor is in the best position to evaluate the parties’ capabilities to cooperate.
 
 Crider,
 
 904 So.2d at 147 (¶ 13).
 

 ¶ 35. Here, while the chancellor awarded joint custody to the parents in his May 2008 judgment, apparently finding their ability to cooperate adequate at the time, several events transpired since that time which could have brought that determination into question; yet, the chancellor did not alter his ruling. Certainly, the DHS reports, criminal charges against Sarah’s father, complaint for citation of contempt by Sarah, and the failure of Michael and the children to adhere to the custody schedule, all point toward a possible inability of the parties to cooperate. At the end of the hearing in September 2008, the chancellor surmised that it was obvious the. two parties harbored great animosity toward one another, and the two children were “being harmed by the conduct of their parents”; and in the future, the court may “have to intervene in the best interest for the children.”
 

 ¶ 36. In December 2008, at the hearing on Sarah’s complaint for contempt against
 
 *696
 
 Michael, the family’s discord apparently increased with the estrangement of Shayla from her mother because of Shayla’s refusal to stay with her mother during the week pursuant to the custody order. The chancellor maintained that he did not want to take any action that might make the situation worse; however, he did not rescind his order of joint custody. Instead, he reiterated that at this point it would be in the best interests of the children to do whatever it took for the parents to maintain joint custody. He ordered family counseling as a starting point. We find that the chancellor was in the best position to determine the best interests of the children at that time, and the chancellor thoroughly considered the issues and ramifications of maintaining joint custody. Therefore, we can find no error in his judgment.
 

 ¶ 37. Regarding Michael’s argument that the chancellor did not consider certain negative facts against Sarah in his
 
 Al-bright
 
 analysis, we fail to see how Michael would presume to know what facts the chancellor did or did not consider. Further, we are not aware of any requirement that the chancellor must acknowledge all of the facts in his analysis of the
 
 Albright
 
 factors that were presented at trial. The chancellor obviously listened to the testimony at trial — negative and positive for both parties' — and made his opinion accordingly. We find no error.
 

 ¶ 38. As to the chancellor’s finding the moral fitness factor neutral, again, we find no error. The chancellor heard testimony from both parties about moral misconduct. Michael went to great lengths and expense to hire several private investigators to prove that Sarah had entered into a relationship with a man after the parties had separated, but before the divorce was final. Sarah finally did admit to this fact, although she stated the individual did not spend time around the children. The only evidence presented of Michael’s post-separation relationship was Sarah’s testimony, and Michael denied it. Sarah also contended that Michael’s female companion spent time around the children. Importantly, Sarah denied any pre-separation affairs during the course of the marriage, whereas Michael admitted to one significant affair, and a detailed affidavit from his mistress was entered into evidence. Also, the parties separated several times during the marriage, both before and after they had children. Each time, Michael would leave the children with Sarah during the separation period. Accordingly, we find no merit to Michael’s argument that he is more morally fit to raise the children than Sarah.
 

 ¶ 39. We conclude that the chancellor did not abuse his discretion in awarding joint custody of the children to Michael and Sarah on an alternating basis.
 

 2. Equitable Distribution of Marital Property and Debts
 

 ¶40. Michael raises several issues regarding the equitable distribution of the parties’ property and debts. We shall discuss each issue in turn.
 

 ¶ 41. “[T]he chancellor must first classify the assets and liabilities as belonging to the marriage, to the husband, or to the wife.”
 
 Smith v. Smith,
 
 856 So.2d 717, 719 (¶ 8) (Miss.Ct.App.2003) (citing
 
 Hemsley v. Hemsley,
 
 639 So.2d 909, 914 (Miss.1994)). “Assets acquired or accumulated during the course of the marriage are subject to equitable division unless it can be shown by proof that such assets are attributable to one of the parties’ separate estates prior to the marriage or outside the marriage.”
 
 Pearson v. Pearson,
 
 761 So.2d 157, 162 (¶ 15) (Miss.2000) (quoting
 
 Hemsley,
 
 639 So.2d at 914). The supreme court established several factors for chan-
 
 *697
 
 eellors to consider when determining the equitable division of marital property.
 
 Ferguson v. Ferguson,
 
 639 So.2d 921, 928 (Miss.1994). The chancellor need not make findings regarding all of the
 
 Ferguson
 
 factors, but may consider only those factors “applicable” to the property in question.
 
 Carrow v. Carrow,
 
 741 So.2d 200, 202 (¶ 10) (Miss.1999) (citing
 
 Weathersby v. Weathersby,
 
 693 So.2d 1348, 1354 (Miss.1997)).
 

 a. Marital Misconduct
 

 ¶ 42. Michael claims that the chancellor did not take into account the marital misconduct of Sarah because the chancellor found the marital property should be divided equally. As he stated in his argument regarding child custody, Michael maintains that Sarah committed adultery, and the chancellor erroneously found that Michael was having an affair at the time of trial due to the statement in his opinion (in reference to his analysis of the
 
 Albright
 
 factors) that “apparently both of these parents have now found significant others in then* lives.” Michael denies having a post-separation affair.
 

 ¶ 43. It is true that the chancellor is entitled to weigh “[mjarital misconduct” as a “viable factor” in his analysis of the
 
 Ferguson
 
 factors, but only “when the misconduct places a burden on the stability and harmony of the marital and family relationship.”
 
 Carrow v. Carrow,
 
 642 So.2d 901, 904-05 (Miss.1994) (citing
 
 Ferguson,
 
 639 So.2d at 927). Michael cites to
 
 Watson v. Watson,
 
 882 So.2d 95 (Miss.2004) in support of his contention. The
 
 Watson
 
 court held that the chancellor erred in the irreconcilable differences divorce by dividing the assets equally and not taking into account Mr. Watson’s adulterous conduct which broke up the parties’ twenty-one year marriage.
 
 Id.
 
 at 108-09 (¶¶ 67-68). The supreme court explained Mr. Watson’s affair was not a “slip-up” or “occasional indiscretion” but an open, continuous affair where he left his ill wife and moved in with a younger woman.
 
 Id.
 
 at 98 (¶ 12), 108 (¶ 67). In
 
 Singley v. Singley,
 
 846 So.2d 1004, 1005 (¶3) (Miss.2002), the supreme court also found the chancellor erred when he divided the marital estate equally in an uncondoned adultery case, and reversed for rehearing on the issue of marital fault and the equitable distribution of the marital property. In
 
 Singley,
 
 the parties had been married for twenty-three years, and Mrs. Singley admitted to having numerous affairs during the marriage.
 
 Id.
 
 at 1006 (¶ 4).
 

 ¶ 44. In the instant case, there was no such open, continuous, and adulterous misconduct which broke up the stability and harmony of the marriage before the parties separated, unless we were to consider Michael’s own adulterous affair in 1995 through 1996, which the chancellor declined to do. The evidence indicates that the Phillipses’ marriage had already deteriorated at the time of Sarah’s affair; the parties had been separated well over a year when Michael’s private investigators obtained proof Sarah was seeing another man. There was no evidence Sarah moved in with the man, nor did she have the children around him. Additionally, we cannot ignore that, although Sarah did not hire her own private investigators, she insists that Michael had begun a relationship with another woman since separation as well. Neither situation is analogous to the extreme misconduct of engaging in either a long-term open affair or numerous affairs during the course of the marriage, such as is found in
 
 Watson
 
 and
 
 Singley,
 
 which actually contributed to the demise of those marriages. We find no error in the chancellor’s equal division of the marital property.
 

 
 *698
 

 b. The “Pre-Separation Agreement”
 

 ¶45. Michael contends that he and Sarah had a “pre-separation agreement” initiated because of Sarah’s alleged financial irresponsibility. Michael is referring to the exchange of the deeds to their property. Michael argues that the chancellor erroneously found he had committed fraud or deceived Sarah into signing the deed. He claims they employed an attorney to handle the transaction, which was explained to her. Indeed, Sarah admitted at trial that she freely signed the deed; however, she denies that she signed it in anticipation of divorce, but in the hopes of saving her marriage.
 

 ¶46. If the chancellor honored this “agreement,” it would have given Sarah considerably less property than she received through the chancellor’s fifty-fifty distribution of the marital property. The chancellor opined that Michael anticipated the divorce and had Sarah sign the deeds to put him at an advantage regarding the division of the marital assets. The court noted that even after the deeds were executed, the parties continued to occupy and use all of the property as they had prior to execution of the deeds. The chancellor concluded that the property was clearly marital in character, regardless of title; therefore, the chancellor deemed all of the real property, other than the one-half acre tract of land, marital.
 

 ¶ 47. While Mississippi follows the title system for determining property rights during marriage, upon divorce, equitable distribution governs property rights, and allows for the division of property earned by either spouse during the marriage, despite whoever holds title. Deborah Bell, Bell on Mississippi Family Law § 6.10 (2005) (citing
 
 Ferguson,
 
 639 So.2d at 928). Therefore, the essence of equitable distribution is “the authority of the courts to award property legally owned by one spouse to the other.”
 
 Ferguson,
 
 639 So.2d at 927 n. 4. Of course, general principles of fraudulent conveyances apply to pre-di-vorce transfers of property as well. Bell on Mississippi Family Law § 6.10.
 

 ¶48. We note the chancellor did not charge Michael with fraudulent conveyance. We agree with the chancellor that due to the timing and circumstance surrounding the transfer of title, Michael’s actions were in anticipation of his divorce. The testimony at trial indicated the transfers were initiated by Michael, not Sarah. Sarah testified Michael kept pestering her until she finally relented and went to the attorney’s office, alone, to sign the documents. We find the chancellor did not abuse his discretion in finding the property at issue remained marital, despite the transfer of title to Michael.
 

 c.
 
 Classification of Certain Debts as Marital
 

 ¶ 49. Michael contends that the chancellor erred in two instances regarding the marital debts. He claims the chancellor should have considered the entire $40,000 he claims the parties borrowed from his parents as marital debt, not merely the $15,000 unpaid promissory note. Additionally, he argues the chancellor should have considered the entire $20,000 loan with the Bank of Jones County as a marital debt, not just $12,201.65. Michael claims he borrowed these funds after the parties separated in order to pay family expenses and bills which resulted from Sarah’s financial irresponsibility.
 

 ¶ 50. Regarding the loan from Michael’s parents, we find the chancellor was correct in finding that the $15,000 promissory note was a valid debt, and Sarah was responsible for half of it. Indeed, this note was entered into evidence with all parties having executed it on April 28, 2003. However, Michael made no mention until trial of an additional $25,000 debt
 
 *699
 
 owed to his parents. On his Rule 8.05 financial statement, he lists $15,000 debt to his father, not $40,000. At trial, however, Michael mentioned for the first time that his parents loaned them a total of $40,000 over the twenty-year marriage to use for “paying family bills or home improvements.” However, Michael did not offer any further evidence regarding this additional debt owed to his parents. We note that Sarah testified that her parents loaned them money as well, but she did not give a specific amount or offer any further evidence. Accordingly, the debt owed by Sarah and Michael to Sarah’s parents was not considered in the chancellor’s division of liabilities. We find that the chancellor did not err in treating the additional $25,000 of alleged debt to Michael’s parents in the same way he treated the alleged debt to Sarah’s parents.
 

 ¶ 51. Concerning the $20,000 loan with the Bank of Jones County, the chancellor did not initially make a ruling on this debt, but later he entered an order finding $12,201.65 of the debt to be marital. Michael borrowed this second of two loans from the Bank of Jones County in April 2006, one month after the parties finally separated, using the homestead property as collateral. Sarah did not sign any documents regarding the loan, and her name did not appear on the loan. Michael testified he used the money on “family bills,” presumably incurred during the marriage. However, Michael offered no evidence on the exact expenditure of proceeds from this loan. We find no error in the chancellor attributing $12,201.65 of the debt as marital.
 

 CONCLUSION
 

 ¶ 52. The chancellor did not err in either his determinations of child custody or equitable distribution. Therefore, we affirm the chancellor’s judgment.
 

 ¶ 53. THE JUDGMENT OF THE CHANCERY COURT OF JONES COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
 

 KING, C.J., LEE AND MYERS, P.JJ., IRVING, GRIFFIS, ISHEE, ROBERTS AND MAXWELL, JJ., CONCUR.
 

 [1]
 

 . Michael also testified that he used part of this loan to build a large shop on the property and for land improvements. Additionally, the pay-off amount increased since he took Sarah’s name off the loan because Michael refinanced the loan in order to have smaller monthly payments.
 

 [2]
 

 . The promissory note, executed on April 28, 2003, provided for fifty payments, commencing on May 15, 2004.