# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2014-CA-00781-COA

**ROBERT H. HARDIN, JR.**                                    **APPELLANT**

**v.**

**BETTY GRANTHAM (HARDIN)**                              **APPELLEE**

DATE OF JUDGMENT:                03/12/2014
TRIAL JUDGE:                     HON. JOSEPH KILGORE
COURT FROM WHICH APPEALED:       CARROLL COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:          TOM P. CALHOUN III
ATTORNEYS FOR APPELLEE:          PATRICIA ABRAHAM RODGERS
                                 KATHERINE TACKETT MILLS
NATURE OF THE CASE:              CIVIL - DOMESTIC RELATIONS
TRIAL COURT DISPOSITION:         DENIED APPELLANT'S MOTION TO
                                 TERMINATE OR MODIFY HIS
                                 PERMANENT-ALIMONY PAYMENTS
DISPOSITION:                     AFFIRMED - 03/01/2016
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE IRVING, P.J., CARLTON AND JAMES, JJ.**

**CARLTON, J., FOR THE COURT:**

¶1.     Robert Hardin Jr. appeals the Carroll County Chancery Court's denial of his petition for modification of alimony. Robert argues on appeal that the chancellor abused his discretion by denying Robert's petition to terminate or modify his permanent-alimony payments to his ex-wife, Betty Grantham. Finding no error, we affirm.

## FACTS

¶2.     Robert and Betty divorced in 1991 after a fourteen-year marriage. As part of the couple's divorce judgment, the chancellor awarded Betty $750 a month in permanent

alimony. In April 2013, Robert stopped making his alimony payments to Betty. The next month, on May 9, 2013, Robert filed a petition to terminate or modify his alimony payments. In his petition, Robert asserted that a material change in circumstances had occurred so as to warrant a modification or termination of alimony.

¶3. The chancellor conducted a hearing on February 7, 2014. Both Robert and Betty testified and submitted Rule 8.05[1] financial statements. As stated in his bench opinion, the chancellor found Betty to be a credible witness. By contrast, the chancellor found that Robert lacked candor and provided answers that were both evasive and inconsistent.

¶4. In determining whether a material change in circumstances had occurred, the chancellor first reviewed the parties' income and expenses at the time of their divorce in 1991. In doing so, the chancellor reviewed and incorporated into his bench opinion some of the findings of fact made by Judge John C. Love Jr., who granted the couple's divorce in 1991. Judge Love had noted that, during the couple's marriage, Robert owned a printing business, Mississippi Printing, and Betty worked as a public schoolteacher. Although Judge Love found that Robert's business was profitable during the course of the marriage, he also found that little equity existed in the business at the time of the divorce due mainly to the $84,000 salary Robert withdrew each year. After concluding that Robert would be unable to continue to draw such a large salary, Judge Love projected Robert's future income to be $40,000, and he based his award of alimony to Betty on that figure.

¶5. After reviewing the parties' income and expenses at the time of their divorce, the

---

[1] *See* UCCR 8.05.

chancellor in the present case next examined the parties' income and expenses at the time of the hearing on Robert's petition. The chancellor also conducted an analysis of the factors set forth in *Armstrong v. Armstrong*, 618 So. 2d 1278, 1280 (Miss. 1993). With regard to the *Armstrong* factors, the chancellor made the following findings in his bench opinion:

> [Robert] is [sixty-five] years old. He has an adjusted gross income, as reported on his 8.05 financial statement, of $5,562 per month. [Robert] testified that there is nothing about his health that would prevent him from being able to take on other work. He lists his personal expenses [as] $4,882.55; however, this amount includes the $750 in alimony that he has not paid since April 2013. He also lists his business expenses of $8,351.74 per month and says that these are due mainly to loan payments, bank and credit[-]card charges, mortgage payments, and interest on loans for the debt owed on his business. He owns two pieces of property in Greenwood, [Mississippi,] one of which is rented by Audio Central[,] and another building that is vacant.
>
> [Robert] has, among other accounts, a $10,000 certificate of deposit and a checking account with a balance of $14,154.62. Both of these are in his name. [Robert] lists numerous liabilities and again credits [these] to the recent misfortunes of the printing industry.
>
> [Betty], on the other hand, is a [sixty-six-year-old] retired schoolteacher who has an adjusted gross income of $3,250.52 and has recently started a part-time job tutoring. She started this subsequent to the alimony payments being stopped. She earns approximately $450 per month from tutoring during school-year months only.
>
> She testified that she cannot work full-time in a class due to severe arthritis in her legs and back, but she receives $2,159.52 in retirement from her over [thirty] years as a teacher in the Mississippi public[-]school system.
>
> [Betty] still resides in the same home that she did since the time immediately following her divorce from [Robert] and has made no extravagant purchases. She lives month-to-month and is dependent on the alimony payment . . . to pay her monthly mortgage and to meet her other monthly expenses. . . . [Betty's] expenses total $3.024.83, and she has no money in savings. [Betty] testified that she has a hard time meeting monthly expenses even when she was receiving alimony from [Robert] and states specifically that it[ has] been very difficult finding the money to pay her property taxes

3

during times of emergency.

[Betty] has approximately $37,000 of equity in her home and has no other assets, other than her 2003 Volkswagon Beetle. [Betty] has had to pay tax penalties because [she] has to pay estimated taxes each quarter based on her projected income . . . , which includes alimony.

[Betty] used the alimony in projecting her income for 2013 and has continued to pay the full amounts of these estimated taxes in spite of not actually receiving the alimony. . . .

In further looking at the *Armstrong* factors, the parties were married for [fourteen] years . . . , and neither party has any minor children in their respective homes.

It appears to the court that[,] after the divorce, the only material change in circumstances is that [Robert's] business became very successful and brought [Robert] many opportunities and luxuries. At no time did [Betty] ask for an increase in alimony. By the time of trial, it appears that [Robert's] financial situation is back where it was at the time of the divorce, but certainly [it] is no worse that it was at the time of the divorce.

Judge Love based the initial [alimony] award . . . on [Robert's] projected income of $40,000 per year and [Betty's] much lower income. The court also acknowledged [Robert's] numerous financial obligations at the time and his substantial debts. There are still numerous financial obligations . . . and substantial debts, and there is still a disparity in income.

¶6. After completing his discussion of the *Armstrong* factors, the chancellor found that no material change in circumstances had occurred that was not reasonably anticipated at the time of the parties' divorce. As a result, the chancellor denied Robert's request for termination or modification of his alimony payments. The chancellor also found that, because Robert had failed to pay alimony since April 2013, he owed ten months of alimony totaling $7,500. Aggrieved by the chancellor's judgment, Robert appeals to this Court.

**STANDARD OF REVIEW**

4

¶7.	"This Court's standard of review in domestic[-]relations matters is extremely limited." *Phillips v. Phillips*, 45 So. 3d 684, 692 (¶23) (Miss. Ct. App. 2010). Our caselaw recognizes that a chancellor possesses broad discretion in alimony cases. *McMinn v. McMinn*, 171 So. 3d 511, 514 (¶8) (Miss. Ct. App. 2014). An appellate court will not disturb a chancellor's findings unless the findings were manifestly wrong or clearly erroneous or unless the chancellor applied an erroneous legal standard. *Phillips*, 45 So. 3d at 692 (¶23). In addition, when the record contains substantial evidence to support the chancellor's findings of fact, we will not reverse his decision. *Id.*

## DISCUSSION

¶8.	On appeal, Robert challenges the chancellor's denial of his petition, arguing that insufficient evidence supported the chancellor's finding that no unanticipated material change in circumstances occurred to warrant the termination or modification of alimony. Robert asserts the evidence shows he has experienced an unforeseeable material change in circumstances since the time of the parties' divorce due to the decline in his business income and the increase in his business expenses.

¶9.	Our caselaw establishes the following framework for chancellors to apply in determining whether to modify an award of permanent alimony:

> [C]hancellors must first determine if an unforeseeable and material change in circumstances occurred since [the] entry of the initial divorce decree. If not, modification is not permitted.
>
> However, if a substantial unanticipated change has in fact occurred, the chancellor should then consider the *Armstrong* factors to determine the appropriate amount of alimony. In evaluating these factors when deciding whether to modify periodic alimony, chancellors should compare the relative

5

positions of the parties at the time of the request for modification in relation to their positions at the time of the divorce decree. As with any alimony consideration, the chancellor must consider the wife's accustomed standard of living, less her own resources, as well as the husband's ability to pay.

*Peterson v. Peterson*, 129 So. 3d 255, 257 (¶¶7-8) (Miss. Ct. App. 2013) (internal citations and quotation marks omitted).

¶10. As previously discussed, the chancellor found that Robert reported the following on his Rule 8.05 financial statement: (1) an adjusted gross income of $5,562 per month; (2) personal expenses of $4,882.55, which included the $750 in alimony that he stopped paying in April 2013; and (3) business expenses of $8,351.74 per month. On appeal, Robert contends that the sum of $8,351.74 represents his combined total personal expenses and business expenses and that his financial statement shows he is currently operating at a net loss.

¶11. According to Robert, at the time of the parties' divorce, Mississippi Printing generated about $80,000 a year for him. However, Robert asserts that his business income has since declined and that he was even forced to close the business in 2008. Robert argues that these events could not be reasonably anticipated at the time of the parties' divorce. In addition, Robert states that he has two pending lawsuits against him, one asserting a claim for $300,000, and the other asserting a claim for $80,000.

¶12. As a result of these developments and his changed financial situation, Robert argues that he can no longer afford to pay his monthly alimony obligation. Robert further asserts that, based on the financial statements the parties submitted, Betty possesses more disposable income than him. Because Robert claims that his business and personal expenses clearly

6

leave him with a significant monthly deficit when compared to his disposable income, Robert asserts that the chancellor erred by failing to terminate or modify his alimony payments.

¶13. Despite Robert's assertions, the Mississippi Supreme Court has previously rejected "the idea that alimony or child[-]support obligations should be reduced because of the obligor's other financial commitments[.]" *Yancey v. Yancey*, 752 So. 2d 1006, 1010 (¶12) (Miss. 1999) (citing *Varner v. Varner*, 666 So. 2d 493, 497 (Miss. 1995)). *See also* N. Shelton Hand, *Mississippi Divorce, Alimony, and Child Custody* § 14–10 (6th ed. 2012) ("Obligations of child and[/]or spousal support are not generally to be considered as or equated with any other debt known to and collectible under the law. There is more to these obligations than mere debt.").

¶14. In *Varner*, a husband argued that the chancellor should reduce his child-support and alimony obligations in light of his other financial obligations. *Varner*, 666 So. 2d at 497. After the parties' divorce, the husband opened his own veterinary practice. *Id.* He also filed for bankruptcy, and he claimed that he had been forced to borrow money from friends and family to pay his child-support and alimony obligations. *Id.* at 495-97.

¶15. On appeal, the supreme court found no merit to the husband's argument that his child-support and alimony obligations should be modified. *Id.* at 497. In fact, the supreme court stated:

> Personal bills cannot be used as a factor to reduce support payments. Furthermore, simply alleging, as does [the husband], that one is subsisting on borrowed funds does not show with the required particularity that he is unable to pay.
>
> In this case, the chancellor properly found that there had been no

7

material change in circumstances. [The husband's] income apparently decreased between the time of his divorce and the hearing. However, that decrease was directly related to his decision to open a solo practice and a voluntary move which caused him to give up his supplemental income. [The husband] filed for bankruptcy on July 7, 1993, two weeks after the chancellor denied his request for modification. His bankruptcy petition was dismissed and the case closed on April 18, 1995.

A debtor is prohibited from discharging debt to a former spouse for alimony or support to a child in connection with a separation agreement. Furthermore, simply filing for bankruptcy does not rise to the level of a substantial change without a finding by the chancellor that the filing was made in good faith. The law is well-settled that, if an obligor, acting in bad faith, voluntarily worsens his financial position so that he cannot meet his obligations, he cannot obtain a modification of support.

*Id.* (internal citations and quotation marks omitted).

¶16. Citing Mississippi precedent, including the supreme court's holding in *Varner*, the chancellor here found no merit to Robert's claim that his alimony payments should be modified or terminated because he had incurred other debts and financial obligations. Instead, the chancellor found that he must compare the parties' relative positions at the time of the divorce with their positions at the time of the requested modification to determine whether an unforeseeable and material change occurred. In looking at the facts of the present litigation, the chancellor ultimately concluded that the only material postdivorce change occurred when Robert's business became very successful and afforded him many opportunities and luxuries.

¶17. As discussed in his bench opinion, the chancellor found the following events occurred after the parties' divorce: (1) Robert built a home in 1995 for about $255,000, which he later sold for about $400,000; (2) he bought a yacht in 2005 for just under $500,000, and although

8

he had to sell the yacht in a short sale, he received an undisclosed amount of money from a lawsuit against the yacht's manufacturer; (3) he purchased a Porsche in 2006 for about $56,000; (4) he purchased a motorcycle in 2007 for about $18,000; and (5) he took a ten-to-fourteen-day vacation to the Yucatán in 2010.

¶18.    Unrelated to Robert's business success, the chancellor also acknowledged that Robert received a substantial inheritance from his father's estate in 1997. In addition, the chancellor found that, the month after Robert stopped paying his alimony obligation, he "went public with a new barbecue company [and] offered prize money in the amount of $1,100 to the winner of the [company's] label contest." Although Robert testified that the business failed to make money and that he turned the business over to his son, the chancellor still found that Robert "publicly stated to the world that he could pay $1,100 while he was not meeting his alimony obligation in this matter."

¶19.    Despite the favorable material change that Robert's business experienced following the parties' divorce, the chancellor found that Betty never sought an increase in Robert's alimony payments. Although the chancellor determined that, by the time of the hearing, Robert's financial situation appeared to have returned to the same level as when the parties divorced, he also stated that Robert's situation was "no worse than it was at the time of the divorce." After analyzing the *Armstrong* factors, the chancellor further concluded that no unanticipated material change occurred to warrant termination or modification of Robert's alimony payments. As a result, the chancellor denied Robert's petition.

¶20.    After reviewing the record and relevant caselaw, we find no abuse of discretion by the

chancellor's denial of Robert's petition. *See McMinn*, 171 So. 3d at 514 (¶8). The record contains sufficient credible evidence to support the chancellor's finding that no unforeseeable material change in circumstances occurred to warrant modification or termination of Robert's permanent-alimony payments. *See id.* at 514-15 (¶8). As a result, we find this issue lacks merit.

¶21. **THE JUDGMENT OF THE CARROLL COUNTY CHANCERY COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, FAIR, JAMES AND WILSON, JJ., CONCUR. GREENLEE, J., NOT PARTICIPATING.**