# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2020-CA-00675-COA

**JASON CLINT DENHAM**                                    **APPELLANT**

**v.**

**REBECCA PRUETT DENHAM**                                    **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 06/18/2020 |
| TRIAL JUDGE: | HON. DEBORAH J. GAMBRELL |
| COURT FROM WHICH APPEALED: | LAMAR COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | JEFFREY BIRL RIMES |
| | SARAH LINDSEY HAMMONS |
| ATTORNEY FOR APPELLEE: | JOHN D. SMALLWOOD |
| NATURE OF THE CASE: | CIVIL - CUSTODY |
| DISPOSITION: | AFFIRMED - 02/01/2022 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**CARLTON, P.J., FOR THE COURT:**

¶1.     Rebecca Pruett Denham (Becky) filed a complaint for divorce against Jason Clint

Denham (Jason) after fifteen years of marriage.  The Lamar County Chancery Court granted

Becky a divorce on the ground of uncondoned adultery.  The court also granted Becky

physical custody of the parties' three minor children, divided the marital estate, and ordered

Jason to pay rehabilitative alimony to Becky in the amount of $350 per month for twenty-

four months.

¶2.     Jason now appeals.  On appeal, Jason asserts the following assignments of error: (1)

the chancellor erred by failing to grant a continuance for good cause; (2) the chancellor erred

by failing to include evidence adverse to Becky in the *Albright*[1] analysis; (3) the chancellor erred by failing to award joint custody; (4) the chancellor erred by awarding Jason less visitation than the amount Becky testified to as being in the children's best interest; (5) the chancellor erred by failing to award standard visitation consistent with Mississippi law; (6) the chancellor erred in her determination of child support; and (7) the chancellor erred in her distribution of the marital property; and (8) the chancellor erred by awarding alimony without making appropriate findings and without a sufficient legal basis.

¶3.     After our review, we affirm the chancellor's judgment.

**FACTS**

¶4.     Becky and Jason were married on July 9, 2002. Three children were born to their marriage.

¶5.     Becky and Jason separated on July 31, 2017, and Becky filed her complaint for divorce on November 7, 2017.  In her initial complaint for divorce, Becky alleged only irreconcilable differences.  In December 2017, the chancellor entered a temporary order granting the parties joint legal custody and joint physical custody of the three minor children. The chancellor also entered an order appointing a guardian ad litem (GAL).

¶6.     On February 6, 2018, Becky filed an amended complaint for divorce, adding allegations of the fault-based grounds of adultery and habitual cruel and inhuman treatment. Jason did not file an answer or assert any affirmative defenses to Becky's initial complaint

---

[1] *Albright v. Albright*, 437 So. 2d 1003 (Miss. 1983).

2

or her amended complaint.

¶7.     On May 29, 2018, the chancellor entered an agreed order setting a trial date of November 14, 2018.

¶8.     On October 15, 2018, approximately one month before trial, Jason's counsel filed a motion to withdraw as counsel. On October 26, 2018, the GAL also filed a motion to withdraw. In her motion to withdraw, the GAL asserted that she had "recently received communication from one of the litigants which caused the [GAL] to be unable to proceed in this case." The GAL explained that "[t]he communication was, at the worst, threatening, and at the best, improper." After a hearing on November 5, 2018, the chancellor entered an order that same day allowing the withdrawal of Jason's counsel and an order allowing the GAL to withdraw after the offering of the GAL's preliminary report at the beginning of the trial in this matter.

¶9.     A three-day trial was held in November 2018. On November 14, 2018, the first day of trial, the chancellor heard testimony from the GAL. Jason had not obtained new counsel at this time, and he moved for a continuance. The chancellor denied his motion, and Jason represented himself pro se. After the GAL's testimony, the chancellor then ordered that the trial reconvene on Tuesday, November 27, 2018. By the time the trial reconvened, Jason had retained new counsel.

¶10.    On November 27 and 28, 2018, the chancellor heard testimony from Jason; Becky; Becky's sister, Lissa Ortego; the Denhams' neighbor, Brett Bean; Paula Henderson, the wife

of Jason's co-worker; Bryan Page, Jason's former co-worker; and Jason's aunt, Cindy Belcher. Jason requested that the chancellor interview the children on-the-record. Becky objected to the children being interviewed and to the interview being on-the-record. The chancellor agreed to interview the children in camera, but the chancellor denied Jason's request for the interview to be on-the-record. Jason objected, but he made no proffer of what the children would have said if a record had been made. Prior to interviewing the children, the chancellor asked the parties if they had questions for the children, and none were submitted. The chancellor ultimately interviewed the children off the record and out of the presence of the parties, with only the parties' counsel and a court staff attorney present.

¶11. On December 17, 2018, the chancellor entered her findings of fact, conclusions of law, opinion, and final judgment. In her order, the chancellor granted Becky a divorce on the ground of uncondoned adultery. The chancellor awarded the parties joint legal custody of the three minor children. The chancellor awarded Becky sole physical custody of the children and awarded Jason "visitation as may be agreed upon between the parties/parents." The chancellor "encourage[d] the parties to work together to schedule visitation that is beneficial to the children and agreeable to all involved." The chancellor provided, however, that if the parties were "unable to agree on reasonable visitation times and circumstances for the children with Jason, then Jason shall be entitled to the following visitation: Weekend custodial visitation commencing on Thursday at 6:00 p.m. and ending on Sunday at 6:00 p.m. on every other weekend." The chancellor also set forth a holiday visitation schedule, which

4

included four weeks of summer visitation for Jason.

¶12.   In making her custody determination, the chancellor considered and applied the factors as set forth in *Albright*.  The chancellor found that the factors were either neutral or favored Becky.  The chancellor did not adopt the findings and recommendation of the GAL, explaining:

> Because the [c]ourt allowed [the GAL] to withdraw and testify at the outset of trial (and thus the GAL was not privy to the rest of the testimony and evidence presented at trial and had no opportunity to weigh in on whether such would alter her preliminary recommendation), the [c]ourt shall not adopt the findings and recommendations of the [GAL] as presented in her Report (Exhibit 2) and per her testimony.  The *Albright* analysis below is thus the [c]ourt's own.

¶13.   The chancellor ordered Jason to pay child support in the amount of $1,736.64 per month.  The chancellor determined that Jason's adjusted gross income for child support purposes was $7,893.81.  She explained that pursuant to Mississippi Code Annotated section 43-19-101(1) (Rev. 2015), the statutory percentage for computing child support for three children was twenty-two percent of the non-custodial parent's adjusted gross income, which in this case amounted to $1,736.64 per month.

¶14.   After determining what property was marital and then determining the value of the marital estate, the chancellor applied the factors in *Ferguson v. Ferguson*, 639 So. 2d 921, 928 (Miss. 1994), and held that "Becky shall be entitled to 60 [percent] of the total value of the marital estate at issue . . . and Jason shall be entitled to 40 [percent] of the total value of the marital estate at issue."  In order to effectuate these percentages, the chancellor ordered Jason to pay Becky a lump sum of $24,487.31.  The chancellor clarified that this payment

5

was for the equitable distribution of the marital estate and did not constitute alimony. The chancellor also explained that Becky "is carrying a much greater share of the marital debt in the division above, even considering the lump sum payment."

¶15. After dividing the marital estate, the chancellor conducted an analysis of the *Armstrong*[2] factors and the *Cheatham*[3] factors and awarded Becky rehabilitative alimony in the amount of $350 per month for 24 months.

¶16. Jason filed a motion for a new trial or, in the alternative, to alter or amend the judgment and to stay the judgment, asserting the following: the chancellor erred in denying Jason's request to grant a continuance; the chancellor erred by only allowing Jason less than half of a day to present evidence and witnesses in support of his case; the chancellor erred and unfairly prejudiced Jason when she excluded Jason's evidence of Becky's marital misconduct relating directly to the *Ferguson*, *Armstrong*, and *Albright* factors; the chancellor erred by excluding the testimony of the minor children, specifically the parties' eldest child; the chancellor erred in her application of the *Albright* factors; the chancellor erred by not awarding the parties joint physical custody; the chancellor erred in her determination and division of the marital estate; the chancellor erred by summarily ordering Jason to pay health insurance and maintain life insurance without making on-the-record findings as to the cost; and the chancellor erred in her determination as to the child support award and alimony

---

[2] *Armstrong v. Armstrong*, 618 So. 2d 1278 (Miss. 1993).

[3] *Cheatham v. Cheatham*, 537 So. 2d 435 (Miss. 1988).

award. The parties both filed several post-trial motions relating to the chancellor's December 17, 2018 order.

¶17. After hearings on the post-trial motions, the chancellor entered an order on June 5, 2020, addressing the motions and amending the final judgment. In her amended final order, the chancellor included Jason's student loan debt, and she accordingly adjusted the total value of the marital estate. The chancellor noted that Jason's Federal Employees Retirement System (FERS) account would have been included in the calculation of the marital estate, but "neither party presented any documentation as to the exact figures for the value of Jason's [retirement account] as well as any other retirement accounts of [Jason]." The chancellor explained that as a result, she could not include an amount in the calculation. The chancellor found that based on Jason's testimony, his retirement account "will be a significant asset for him," and she therefore "[took] this into consideration in this distribution." The chancellor also omitted the requirement for Jason to make a lump sum payment of $24,487.31 to Becky. On June 18, 2020, the chancellor entered another order amending the final order, clarifying that a Highlander vehicle was allocated to Jason.

¶18. Jason now appeals. On appeal, Jason asserts eight assignments of error. We have combined several of these issues for purposes of clarity in our discussion.

**STANDARD OF REVIEW**

¶19. On appeal, "[t]his Court will not disturb a chancellor's judgment when it is supported by substantial credible evidence unless the chancellor abused [her] discretion, was manifestly

7

wrong or clearly erroneous, or applied an erroneous legal standard." *Thornton v. Thornton*, 322 So. 3d 485, 490 (¶7) (Miss. Ct. App. 2021). "We review issues of law de novo." *Id*.

## DISCUSSION

¶20.    As a preliminary issue, Becky asserts that Jason's notice of appeal states he is appealing from the June 5, 2020 amended final order and the June 18, 2020 order amending the final order. Becky claims that based on his notice of appeal, Jason does not seek appellate review of the chancellor's December 17, 2018 order. As a result, Becky argues that "this appeal should be reviewed solely on the standard of review for post-trial motions." Becky submits that because Jason cited no authority to support a claim that the denial of his post-trial motion was in error, Jason's appellate claims are procedurally barred.

¶21.    However, as Becky acknowledges, Jason's appellate brief "focused largely" on the alleged errors in the chancellor's December 17, 2018 order. The Mississippi Supreme Court has held "that if the 'statement of issues and appellant['s] brief clearly show' that a certain order or issue is being appealed, we will consider the merits of the issue." *McNeese v. McNeese*, 119 So. 3d 264, 269 (¶11) (Miss. 2013); *see also* M.R.A.P. 3(c) ("An appeal shall not be dismissed for informality of form or title of the notice of appeal."). Because Jason's statement of issues and brief clearly showed that he is contesting the December 17, 2018 order, this Court will consider the merits of that ruling. *See McNeese*, 119 So. 3d at 269 (¶11).

    **I.**      **Failure to Grant a Continuance**

¶22.   Jason first argues that the chancellor erred in failing to grant his ore tenus motion for a continuance on the first day of the trial.  Jason asserts that shortly before the trial date, he discovered that his prior counsel had not filed an answer or asserted any affirmative defenses, nor had his prior counsel produced certain documents to opposing counsel during discovery. Jason states that even after he was able to obtain counsel for the second and third days of trial, his prior counsel's deficiencies, coupled with the chancellor's refusal to allow a continuance, "prove[d] extremely damaging to his case."  As a result, Jason argues that he suffered prejudice due to the chancellor's refusal to grant a continuance.

¶23.   We recognize that "trial courts have 'the inherent right' to control their dockets and are afforded reasonable latitude regarding the setting and continuance of cases." *Sullivan v. Sullivan*, 43 So. 3d 536, 539 (¶14) (Miss. Ct. App. 2010).  "The decision to grant or deny a motion for a continuance is within the discretion of the trial court and will not be grounds for reversal unless shown to have resulted in manifest injustice." *Munday v. McLendon*, 287 So. 3d 303, 313 (¶42) (Miss. Ct. App. 2019) (quoting *Profilet v. Profilet*, 826 So. 2d 91, 93 (¶6) (Miss. 2002)).  "Prejudice must result from the denial in order to have that decision reversed." *Kaiser v. Kaiser*, 281 So. 3d 1136, 1144 (¶33) (Miss. Ct. App. 2019).

¶24.   As stated, on October 15, 2018, Jason's counsel filed a motion to withdraw as counsel. On November 5, 2018, the chancellor held a hearing on the matter.  At the hearing, Jason's then-counsel informed the chancellor that when he filed his motion to withdraw, Jason "indicated at the time that he had other counsel that would be representing him.  At that

9

point, I sent both of those new counsels orders of substitution." Jason then clarified that although he had spoken to two attorneys who agreed to represent him in the matter, neither of the attorneys was prepared to enter an order of appearance at that time. However, Jason stated that he thought one of the attorneys "wanted to do a motion of appearance this week." Becky's counsel confirmed that these two attorneys had been copied on e-mail correspondence regarding the case since October 25, 2018.

¶25. The chancellor informed Jason that his new counsel would not have to enter a motion of appearance but rather sign an agreed order of substitution. The chancellor stated that the trial was set for the following week, and she declined to move the trial date. Additionally, as stated above, the chancellor set the trial date in an agreed order entered on May 29, 2018.

¶26. On November 14, 2018, the first day of trial, Jason appeared at court without counsel. Jason then requested a thirty-day continuance. The chancellor stated, "I'm not inclined to grant continuances on the day of trial for the following reasons: This trial has been set for a while. You indicated to the [c]ourt that you have spoken with attorneys." Jason explained that both attorneys were still willing to represent him, but they had scheduling conflicts with the present date. Jason also indicated that he had spoken to a third attorney about representing him. Jason stated that the attorneys had informed him that his case file was "lacking pertinent information" because his prior counsel had not issued subpoenas.

¶27. Becky's counsel objected to Jason's motion for a continuance, explaining that this matter had been pending since 2017. Becky's counsel further stated that on October 25,

10

2018, he was forwarded emails from Jason "indicating that [Jason] intended to start acting in a de facto pro se representation until other things were in order."

¶28. The chancellor ultimately ruled that the trial would begin on November 14, 2018, and that only the GAL would testify on that date. The transcript shows that Jason proceeded pro se and was provided the opportunity to cross-examine the GAL regarding the contents of her report. At the conclusion of the GAL's testimony, the chancellor ruled that the trial would reconvene on November 27, 2018.

¶29. During the remainder of the trial, Jason was represented by counsel. Jason argues that despite having representation, the inactions of his previous counsel and the chancellor's failure to grant a continuance to allow his new counsel additional time to prepare damaged his case.

¶30. In support of his argument, Jason cites to *Schepens v. Schepens*, 592 So. 2d 108, 109 (Miss. 1991). In *Schepens*, the appellee failed to disclose two adverse witnesses until four days before trial. *Id*. The appellant requested a continuance in order to depose the witnesses, and the chancellor denied the request. *Id*. On appeal, the supreme court remanded the case back to the chancellor after finding that the appellant's "lack of an opportunity to prepare for the two adverse non-family witnesses could have affected the evidence presented and, necessarily, the chancellor's decision." *Id*. at 109-10.

¶31. However, in a case factually similar to the one before us, this Court affirmed the chancellor's denial of a continuance where the appellant moved for the continuance on the

11

day of trial and ended up representing himself during the proceedings. *Sullivan*, 43 So. 3d at 539 (¶13). In *Sullivan*, the chancellor allowed the appellant's attorney to withdraw as counsel a little over two weeks before the trial date. *Id*. On the day of trial, the appellant made an oral motion for a continuance. *Id*. The chancellor denied the appellant's motion based on the short notice (i.e., the motion was made only "hours before trial") and the "inconvenience to witnesses." *Id*. The appellant then represented himself at trial. *Id*. at (¶11). On appeal, this Court found that "even though [the appellant] represented himself, he questioned [the opposing party's] witnesses extensively." *Id*. at (¶13). After reviewing the record and final judgment, this Court ultimately found that the appellant "was neither prejudiced in representing himself nor by the denial of the requested continuance," and therefore "no manifest injustice resulted from the chancellor's denial of the continuance." *Id*. at (¶14).

¶32. In the present case, like *Sullivan*, we find that Jason was not prejudiced by representing himself during the GAL's testimony, nor was he prejudiced as a result of the chancellor's denial of the continuance. We accordingly find that no manifest injustice resulted from the chancellor's denial of the continuance.

## II. Child Custody

¶33. Jason next raises issues with several of the chancellor's rulings regarding child custody. Jason claims that the chancellor failed to allow or simply ignored evidence adverse to Becky that would have "drastically" impacted the *Albright* analysis. Jason further claims

that the chancellor erred by not allowing the children to testify regarding their preference and by disregarding the GAL's testimony that the parties' eldest child desired joint custody. Jason argues that the chancellor erred by failing to award joint custody, despite the "abundant" evidence at trial that showed joint custody had been working well for the children for the past year. Regarding visitation, Jason argues that the chancellor awarded him less visitation than the amount Becky testified would be in the best interest of the children.

¶34. In a child custody matter, this Court will not reverse the chancellor's decision "unless the trial court made findings that are manifestly wrong or clearly erroneous or applied an improper legal standard." *Bingham v. Johnson*, 322 So. 3d 948, 951 (¶17) (Miss. Ct. App. 2021) (citing *Smith v. Smith*, 97 So. 3d 43, 46 (¶7) (Miss. 2012)). "So long as there is substantial evidence in the record that, if found credible by the chancellor, would provide support for the chancellor's decision, this Court may not intercede simply to substitute our collective opinion for that of the chancellor." *Id*. at 951-52 (¶17). "[T]he polestar consideration in child custody cases is the best interest and welfare of the child." *Albright*, 437 So. 2d at 1005.

¶35. In *Albright*, the Mississippi Supreme Court enumerated factors for a court to consider as guidance when making a custody determination. *Id*. These factors include the following:

> [the child's age, health, and gender;] a determination of the parent that has had the continuity of care prior to the separation; which has the best parenting skills and which has the willingness and capacity to provide primary child care; the employment of the parent and responsibilities of that employment; physical and mental health and age of the parents; emotional ties of parent and child; moral fitness of parents; the home, school and community record of the

13

child; the preference of the child at the age sufficient to express a preference by law; stability of home environment and employment of each parent, and other factors relevant to the parent-child relationship.

*Id*. The supreme court also held that "[m]arital fault should not be used as a sanction in custody awards." *Id*.

### A. Albright *Analysis*

¶36. Jason argues that the chancellor's *Albright* analysis failed to make any negative findings regarding Becky. Jason specifically takes issue with the "moral fitness" factor, arguing that although the chancellor acknowledged Becky's infidelity, she "minimize[d] the infidelity" by characterizing it as a single one-night stand. Jason submits that the chancellor improperly "shut down" Jason's attempts to delve further into Becky's alleged infidelity based on the fact that Jason failed to plead an affirmative defense or allege adultery in an answer. Jason maintains that further testimony regarding Becky's infidelity was relevant for a proper *Albright* analysis. Jason also argues that the chancellor excluded Becky's testimony that she was emotionally abusive to Jason and that she had thrown his phone.

¶37. During Jason's testimony, his counsel asked, "And how many extramarital affairs are you aware of that Becky had during the course of your marriage?" Becky's counsel objected, arguing that Jason did not file a counterclaim for adultery or condonation. Jason's counsel argued that the questioning was relevant to the *Albright* factor regarding the moral fitness of the parent. The chancellor overruled the objection, and Jason was allowed to answer that he was aware of two extramarital affairs that Becky had during their marriage.

14

¶38. During cross-examination of Becky, Jason's counsel questioned her about her admitted one-night stand and then attempted to question Becky about possible additional affairs. Becky's counsel objected, arguing that Jason failed to file an answer or any affirmative defenses. After hearing arguments from counsel, the chancellor sustained the objection, explaining, "You did not affirmatively plead condonation of [Jason's] affairs or the fact that [Becky] has had affairs, so let's move on."

¶39. The transcript reflects that Jason failed to make a proffer of what Becky's testimony would be about: whether she had engaged in an extramarital affair with her co-worker. Our recent supreme court caselaw states that "[i]t is well recognized that a trial court will not be reversed for limiting cross-examination where no proffer was made of the testimony nor was a statement dictated into the record to indicate what was proposed to be shown by the examination." *Christmas v. State*, 10 So. 3d 413, 420 (¶32) (Miss. 2009) (internal quotation marks omitted). Furthermore, "[w]hen testimony is not allowed at trial, a record of the proffered testimony must be made in order to preserve the point for appeal." *Jackson v. State*, 245 So. 3d 433, 441 (¶45) (Miss. 2018); *see also Roebuck v. Massey*, 741 So. 2d 375, 383 (¶23) (Miss. Ct. App. 1999). We also find that because Jason was provided a chance to testify that he "believe[d]" that Becky had engaged in two extramarital affairs, he was not prohibited from presenting evidence relevant to *Albright*'s moral-fitness factor.

¶40. Furthermore, Jason admits in his brief that he did not file an answer, counterclaim, or affirmative defense in this matter. As a result, we find that he "cannot offer evidence outside

15

the scope of the complaint and cannot offer any evidence supporting any affirmative charge." *Rawson v. Buta*, 609 So. 2d 426, 431 (Miss. 1992).[4] The supreme court has held that "if evidence is offered by a party which is outside the scope of the pleadings and the other party fails to object, the opponent will be considered to have impliedly consented to the issue and the pleading will be amended accordingly[.]" *Lahmann v. Hallmon*, 722 So. 2d 614, 619 (¶16) (Miss. 1998). However, as stated, Becky's counsel objected to the line of questioning regarding any other alleged infidelities. Additionally, "condonation is an affirmative defense [to adultery] that must be specifically pled or else it is waived." *Ashburn v. Ashburn*, 970 So. 2d 204, 213 (¶24) (Miss. Ct. App. 2007). Because Jason did not plead the defense of condonation, he waived his right to rely on this defense. *Id*. at (¶25). We reiterate that "[m]arital fault should not be used as a sanction in custody awards." *Albright*, 437 So. 2d at 1005.

¶41.    Regarding Jason's argument that the chancellor did not consider certain negative facts or make any negative findings against Becky in her *Albright* analysis, "we fail to see how [Jason] would presume to know what facts the chancellor did or did not consider." *Phillips v. Phillips*, 45 So. 3d 684, 696 (¶37) (Miss. Ct. App. 2010). The supreme court has held that it is the chancellor's duty to "determine the credibility and weight of [the] evidence."

---

[4] We recognize that in *Rawson*, 609 So. 2d at 430, the supreme court clarified that even if a defendant fails to file an answer, he is still allowed to "present[] proof rebutting the plaintiff's proof." However, in this case, Jason never attempted to offer any rebuttal evidence or proof to Becky's assertion that she only engaged in one extramarital affair.

*Powell v. Ayars*, 792 So. 2d 240, 243 (¶6) (Miss. 2001). "[W]e are not aware of any requirement that the chancellor must acknowledge all of the facts in [her] analysis of the *Albright* factors that were presented at trial." *Phillip*s, 45 So. 3d at 696 (¶37). Our review of the record shows that "[t]he chancellor obviously listened to the testimony at trial—negative and positive for both parties—and made [her] opinion accordingly." *Id*.

### B.     Children's Testimony and Preference

¶42.    Jason next argues that by excluding the children's testimony, the chancellor violated the supreme court's holding in *Jethrow v. Jethrow*, 571 So. 2d 270 (Miss. 1990). In *Jethrow*, the supreme court explained that in deciding whether to exclude "the testimony of a child witness of tender years in a divorce proceeding," the chancellor must determine if the child is competent to testify and second, determine whether it is in the child's best interests to testify. *Id*. at 273-74. However, the supreme court "reiterate[d] that parents in a divorce proceeding should if at all possible refrain from calling any of the children of their marriage, of tender years at least, as witnesses, and counsel should advise their clients against doing so except in the most exigent cases." *Id*. at 274.

¶43.    At trial, Jason's counsel objected to the chancellor's ruling that the parties' children, specifically the fifteen year old and the ten year old, could not testify on-the-record. In making her decision to exclude the children's testimony, the transcript shows that the chancellor first considered whether the children were competent to testify and whether testifying would be in the children's best interests. The chancellor ultimately determined that

17

it would not be in the children's best interests to testify, explaining, "It is not in the best interest of children who love both of their parents to be forced to come in here and testify or me to put them in a room with lawyers for their mom and dad to try to elicit who is a better parent." We recognize that "no parent can be precluded from having a child of the marriage in a divorce proceeding testify simply because of that fact." *Jethrow*, 571 So. 2d at 274. However, in the present case, the transcript reflects that the chancellor did not exclude the children's testimony simply because it was a divorce proceeding but rather because of the contentious nature of the proceedings and the animosity between the parties. The chancellor commented on the acrimony between the parties several times throughout the proceedings, and the GAL even testified that the animosity between the parties led to her finding that joint custody would not be a workable arrangement.

¶44. Additionally, the record reflects that although Jason objected, he made no proffer of what the children would have said if a record had been made. In the recent case of *Roley v. Roley*, 329 So. 3d 473, 505 (¶100) (Miss. Ct. App. 2021), *cert. denied*, 329 So. 3d 1200 (Miss. 2021), this Court held that the appellant's argument that the chancellor erred by failing to allow the minor children to testify as to their custody preference was procedurally barred because the appellant made no proffer of the children's testimony. (Citing *Waller v. Wall*, 273 So. 3d 717, 720 (¶11) (Miss. 2019)).

¶45. After our review, we find that the chancellor did not abuse her discretion by not allowing the children to testify. *See Sheridan v. Cassidy*, 273 So. 3d 783, 789 (¶25) (Miss.

18

Ct. App. 2018) (affirming a chancellor's decision to exclude the testimony of the children where the chancellor determined that testifying would not be in the children's best interests).

¶46.    Regarding the GAL's testimony that the parties' eldest child expressed a desire for joint custody, the record shows that the GAL ultimately recommended that "Becky would have primary physical custody subject to Jason's visitation rights." The GAL explained that "based on the animosity between the parties[,] . . . joint custody would not be a workable arrangement." The chancellor arrived at the same custody determination, although the chancellor stated in her December 17, 2018 order that she did not adopt the findings and recommendation of the GAL "[b]ecause the [c]ourt allowed the [GAL] to withdraw and testify at the outset of trial (and thus the GAL was not privy to the rest of the testimony and evidence presented at trial and had no opportunity to weigh in on whether such would alter her preliminary recommendation)." However, the chancellor's order reflects that although she did not adopt the GAL's report and recommendation, she still considered them. This Court "is not bound by the [GAL's] recommendation" or testimony. *Barber v. Barber*, 288 So. 3d 325, 331 (¶26) (Miss. 2020). Where a chancellor's appointment of a GAL was discretionary, as in the case before us, "the chancellor is not required to include his or her reasons for rejecting the GAL's recommendation." *Kaiser*, 281 So. 3d at 1142 (¶21) (citing *Porter v. Porter*, 23 So. 3d 438, 449 (¶28) (Miss. 2009)).[5] The chancellor was therefore

---

[5] Where no allegations of abuse were present mandating the appointment of a GAL, as in the case before us, "the chancellor's appointment of the GAL was discretionary and not statutorily mandated pursuant to [Mississippi Code Annotated] section 93-5-23." *Kaiser*,

within her discretion to disregard the GAL's findings and report.

¶47.    The record further shows that although the chancellor did not allow the children to testify on-the-record, the chancellor did interview the children off the record and outside the presence of the parties, with only the parties' counsel and a court staff attorney present.  As stated, Jason made no proffer as to what the children's testimony would be if a record was made.  We recognize the supreme court's instruction that a record must be made of a chancellor's in-chambers interview with children in a custody proceeding.  *See Robison v. Lanford*, 841 So. 2d 1119, 1125-26 (¶21) (Miss. 2003).  Although the chancellor did not make a record of her in-camera interview with the children in the present case, the transcript shows that the GAL testified at trial that the eldest child preferred joint custody.  Therefore, based on the particular facts of the case before us, we find that the chancellor's failure to make a record of her in-camera interview with the children was harmless error.

C.    *Visitation*

¶48.    Jason submits that because the parties shared joint physical custody during the pendency of the temporary order, the chancellor ultimately should have awarded both parties permanent joint physical custody.  However, the record shows that at the time the temporary order was entered, no *Albright* analysis had been performed.  Furthermore, the record contains ample evidence of the contentious relationship between Jason and Becky.

¶49.    Regarding visitation, Jason argues that the chancellor awarded him less visitation than

281 So. 3d at 1142 (¶21).

20

the amount Becky testified would be in the best interest of the children. Specifically, Jason asserts that the chancellor only awarded Jason four weeks of summer visitation, despite the "standard" summer visitation being five weeks.

¶50. "Visitation is a matter within the chancellor's sound discretion," and we afford great deference to a chancellor's decision regarding visitation. *Gilliland v. Gilliland*, 969 So. 2d 56, 72 (¶59) (Miss. Ct. App. 2007). We recognize that "[e]xcept in unusual circumstances, a noncustodial parent is entitled to unrestricted standard or liberal visitation." *Michael v. Smith*, 237 So. 3d 183, 189 (¶26) (Miss. Ct. App. 2018) (citing Deborah H. Bell, *Bell on Mississippi Family Law* § 5.08[2] (1st ed. 2005)). "Standard visitation includes two weekends a month until Sunday afternoon and at least five weeks of summer visitation, plus some holiday visitation." *Id.* (internal quotation marks omitted). "However, the chancellor is vested with the discretion to determine whether the best interests of the children mandate liberal visitation or instead a more limited visitation provision." *Gilliland*, 969 So. 2d at 72 (¶59).

¶51. In her December 17, 2018 order, the chancellor awarded Jason "visitation as may be agreed upon between the parties/parents" and "encourage[d] the parties to work together to schedule visitation that is beneficial to the children and agreeable to all involved." The chancellor stated that if "Jason and Becky [are] unable to agree on reasonable visitation times and circumstances for the children with Jason, then Jason shall be entitled to the following visitation," and the chancellor provided a specific visitation schedule. This schedule

21

included "[w]eekend custodial visitation . . . commencing on Thursday at 6:00 p.m. and ending on Sunday at 6:00 p.m. on every other weekend," four weeks of summer visitation, and a holiday visitation schedule. Keeping in mind the broad deference afforded a chancellor's visitation schedule, we affirm the chancellor's ruling. *See Marshall v. Harris*, 981 So. 2d 345, 350-51 (¶25) (Miss. Ct. App. 2008) (finding that four weeks in summer is adequate and that the chancellor has substantial discretion in awarding visitation); *Horn v. Horn*, 909 So. 2d 1151, 1162 (¶39) (Miss. Ct. App. 2005) (holding the chancellor did not err in ordering four weeks of summer visitation rather than five weeks).

¶52.    After our review, we affirm the chancellor's custody decision.

### III.    Child Support

¶53.    Jason argues that the chancellor failed to make findings as to the reasonableness of the amount of child support ordered. Jason also asserts that the chancellor erred by calculating Jason's child support obligation based on his current income rather than his projected income with adjustments for the chancellor's dependency allowance. Jason further argues that the chancellor did not address the cost of health insurance or life insurance, which she ordered Jason to maintain, and the chancellor also failed to provide a "mathematical justification" as to why Jason must pay Becky $250 per month for extracurricular activities.

¶54.    "A chancery court has discretion in determining an award of child support." *Gunter v. Gunter*, 281 So. 3d 283, 285 (¶8) (Miss. Ct. App. 2019). Upon review, we "will not find an abuse of discretion when the required support is equal to the amount that is presumptively

22

correct under the child-support guidelines." *Id*.

¶55. Our review of the record shows that the chancellor awarded child support in accordance with the statutory guidelines based on Jason's current income, as is required. Section 43-19-101(3) provides the calculation for determining a party's adjusted gross income, and it includes "[d]etermin[ing] gross income from all potential sources that *may reasonably be expected to be available* to the absent parent." (Emphasis added). Jason failed to cite any authority in support of the chancellor's ordering child support based on some future potential income. Additionally, because the chancellor did not deviate from the statutory guidelines when awarding child support, "no written findings of fact were required." *See Bryant v. Bryant*, 924 So. 2d 627, 632 (¶19) (Miss. Ct. App. 2006); Miss. Code Ann. § 43-19-101(2).

¶56. As to Jason's claim that the chancellor erred by failing to make findings as to the cost of the health insurance, section 43-19-101(3) provides, in pertinent part:

> In any case in which the support of any child is involved, the court shall make the following findings either on the record or in the judgment:
>
> (a)     The availability to all parties of health insurance coverage for the child(ren);
>
> (b)     The cost of health insurance coverage to all parties.

¶57. In the chancellor's December 17, 2018 order, she ordered Jason to maintain the children on his health and dental insurance and to maintain his existing life insurance coverage with the children named as beneficiaries. Although the chancellor did not specify

23

the exact cost of the health insurance coverage, she found that "[b]oth parties have more than adequate incomes and have insurance available to them."

¶58. We also find that the chancellor's order requiring Jason to pay Becky $250 per month for extracurricular activities is supported by the record. At trial, Becky testified that the parties had always shared the cost of the children's extracurricular activities. However, the chancellor explained that she "[does not] like the splitting extracurricular [costs] with people who can't communicate." The chancellor stated that she preferred to "take a figure and have a person pay a certain amount [toward that figure] and be done, . . . [to avoid] any future controversy." The chancellor ordered the parties to meet during the court's recess to determine the average cost per month for the children's extracurricular activities and school lunches.

¶59. The chancellor ultimately ordered Jason to pay $250 per month for his share of the cost of the children's extracurricular activities. In determining this amount, the chancellor considered testimony regarding the cost of the children's activities as well as an exhibit admitted into evidence listing the children's shared expenses. This Court has affirmed a chancellor's award of child support plus an additional payment toward a child's extracurricular activities. *See generally Gunter*, 281 So. 3d at 286 (¶¶9-10); *Barnett v. Barnett*, 908 So. 2d 833, 846 (¶32) (Miss. Ct. App. 2005). We find that the chancellor's child support award is supported by substantial evidence.

## IV. Equitable Distribution

24

¶60.   Jason next challenges the chancellor's distribution of the marital estate. Jason asserts that during the trial, the chancellor either failed to allow or failed to properly consider evidence that favored Jason with respect to the marital estate and the parties' respective financial obligations.   Specifically, Jason claims that the chancellor failed to consider evidence of an appraisal performed on the marital home that would have showed a higher value for the marital home.   Jason submits that the chancellor also applied a different standard to the retirement of both parties when making her award of equitable distribution. Jason further argues that at the hearing on Jason's post-trial motion, the chancellor acknowledged the omission of Jason's student loan debt from her prior order, but the chancellor failed to allow evidence regarding that debt.

¶61.   This Court will uphold a chancellor's division and distribution of marital property if the chancellor's decision is supported by substantial credible evidence. *Jenkins v. Jenkins*, 67 So. 3d 5, 8 (¶8) (Miss. Ct. App. 2011).   To equitably divide marital property, the chancellor must (1) classify the parties' assets as marital or separate, (2) value those assets, and (3) equitably divide the marital assets. *Hemsley v. Hemsley*, 639 So. 2d 909, 914 (Miss. 1994); *Ferguson*, 639 So. 2d at 928.   "[T]he chancellor must evaluate the equitable division of all marital property pursuant to the guidelines listed in *Ferguson*." *Walker v. Walker*, 36 So. 3d 483, 487 (¶12) (Miss. Ct. App. 2010).   "[T]he goals of equitable distribution are a fair division of marital property based on the facts of each case and termination of the legal relationship in a manner in which each party may realize self-sufficiency." *Lacoste v.*

25

*Lacoste*, 313 So. 3d 1097, 1103 (¶18) (Miss. Ct. App. 2021). "When the facts and circumstances warrant an equitable division of the marital estate of one-half or greater and such a division complies with the *Ferguson* principles, then we are duty bound to let such a distribution stand." *Id.* (quoting *Phillips v. Phillips*, 904 So. 2d 999, 1003 (¶13) (Miss. 2004)).

¶62. Relevant to the issues before us, we recognize that "the foundational step to make an equitable distribution of marital assets is to determine the value of those assets based on competent proof." *Williams v. Williams*, 303 So. 3d 824, 833 (¶35) (Miss. Ct. App. 2020). "The valuation of the property is a question of fact[,]" and "the chancellor has sole authority to assess both the credibility and weight of witness testimony." *Id.*

¶63. In the present case, the chancellor classified the marital property and considered each *Ferguson* factor:

(1)   contribution to the accumulation of property,

(2)   dissipation of assets,

(3)   the market or emotional value of assets subject to distribution,

(4)   the value of assets not subject to distribution,

(5)   the tax and economic consequences of the distribution,

(6)   the extent to which property division may eliminate the need for alimony,

(7)   the financial security needs of the parties, and

(8)   any other factor that in equity should be considered.

26

*Carter v. Carter*, 98 So. 3d 1109, 1113 (¶13) (Miss. Ct. App. 2012).

¶64.    After applying the *Ferguson* factors, the chancellor determined that "Becky shall be entitled to 60 [percent] of the total value of the marital estate at issue . . . and Jason shall be entitled to 40 [percent] of the total value of the marital estate at issue."  In order to reach these percentages, the chancellor ordered Jason to pay Becky a lump sum of $24,487.31.  The chancellor clarified that this payment was for the equitable distribution of the marital estate and did not constitute alimony.  The chancellor also stated that Becky "is carrying a much greater share of the marital debt in the division above, even considering the lump sum payment."

¶65.    After a hearing on the parties' post-trial motions, the chancellor entered an amended order.  In the amended order, the chancellor included Jason's student loan debt, and she accordingly adjusted the total value of the marital estate.  The adjusted value of the marital estate affected the amount awarded to each party, and the chancellor accordingly omitted the requirement for Jason to make a lump sum payment of $24,487.31 to Becky.  On June 18, 2020, the chancellor entered another order amending the final order, clarifying that the Highlander vehicle was allocated to Jason.

¶66.    On appeal, Jason admits that the chancellor's amended order acknowledged her prior omission of his student loans, but Jason claims that the chancellor still erred by "refusing to accept the figure that was on Jason's [Uniform Chancery Court Rule] 8.05 [financial statement]" showing a student loan debt of $82,000.  At trial, Jason testified that he had

27

student loan debt in the amount of $81,000. When asked if he listed this debt on his Rule 8.05 statement, Jason admitted, "Probably not." Jason agreed to add the loan debt to his amended Rule 8.05 statement. Jason's amended Rule 8.05 statement shows a handwritten note stating that his Nelnet student loan debt is roughly $81,000. On the document, it appears that Jason either wrote $82,000 and then tried to write a "1" over the "2" to correct the amount, or vice versa. Another document titled "Summary of Marital Debt" was admitted into evidence as Exhibit 11, and the record shows that the parties amended this document as needed at trial. Exhibit 11 shows the following debt: "Nelnet Student Loan $81,000 (Jason)."

¶67. In her amended order, the chancellor acknowledged that Jason's amended Rule 8.05 statement indicated that he had student loan debt in the amount of $82,000, but she found that "[n]othing was offered to substantiate" the amount. Regardless, the chancellor's amended order clearly shows that she included Jason's student loan debt of $81,000 as a marital debt, and she further included it in her division of the marital debts. The chancellor then accordingly adjusted the value of the marital estate. Although Jason's brief claims that the actual amount of the student loan debt was $82,000, his testimony and the "Summary of Marital Debt" document clearly state that the amount was $81,000. We therefore find no error.

¶68. As to Jason's argument regarding his retirement plan, the testimony reflects that as a federal employee, Jason had a FERS account and a FERS Thrift Savings Plan (TSP)

28

account. Jason was able to provide the value of his TSP account, but he was unable to calculate the value of his FERS account. In the chancellor's December 17, 2018 order, she included Jason's TSP retirement account as part of the marital estate, but she did not include Jason's FERS account.

¶69. On February 11, 2019, the chancellor held a hearing on the parties' post-trial motions. A few days after the hearing, Becky filed a supplemental response to Jason's motion for a new trial, asserting that because the December 17, 2018 order did not identify Jason's FERS account as a part of the marital estate, "it is assumed that Jason was awarded the entirety of this marital asset." The record reflects that on June 7, 2019, the chancellor held a subsequent conference with counsel and requested that Jason provide additional documentation showing his FERS benefits through the date of demarcation (December 2017). On September 9, 2019, Becky filed a motion to compel and requested the chancellor to order Jason to provide the parties and the court with the projection of his FERS annuity payments based on both current service and anticipated retirement. The chancellor held a motion hearing on October 21, 2019, and she again ordered Jason to provide the required FERS documentation: specifically, a statement reflecting Jason's employment status and hire date and containing the vested value of his FERS account. On April 4, 2020, the chancellor held a status conference and yet again ordered Jason to provide documentation regarding his FERS annuity estimate.

¶70. Throughout the course of the proceedings, Jason maintained that no such FERS statement existed. The chancellor informed Jason that parties in other cases had provided

29

FERS annuity estimates to the court. Jason eventually submitted an email from a human resources specialist at Jason's employment stating that the dollar value for contributions made by Jason to his FERS account, as of the line of demarcation, was $14,214.81. The email did not include the vested value of Jason's FERS account within the specified time frame, and therefore it did not provide the necessary information requested by the chancellor.

¶71. In the chancellor's June 5, 2020 amended order, she explained that "[the] difficulty in finalizing this matter is that the necessary information needed from FERS . . . has not been provided." The chancellor referenced the "numerous" motions to compel regarding Jason's FERS documentation, and the chancellor stated that she had warned counsel that if she did not receive this information, she would rule without it. The chancellor explained that she would have included Jason's federal retirement plan in the calculation of the marital estate, but because neither party presented any documentation as to the exact figures for the value of his retirement account, the chancellor could not include an amount in her calculation. The chancellor found, however, that based on Jason's testimony, his retirement account "will be a significant asset for him" and that she "[has] taken this into consideration in this distribution."

¶72. Our review of the record shows that the chancellor diligently tried to find the value of Jason's FERS account during the relevant time period. This Court has held that "it is incumbent upon the parties, and not the chancellor or opposing party, to prepare evidence touching on matters pertinent to the issues to be tried." *Pond v. Pond*, 302 So. 3d 1236, 1240

30

(¶13) (Miss. Ct. App. 2020).  Jason alone was responsible for preparing and submitting the necessary documentation regarding his FERS account at trial.  *Id*.  "Where a party fails to provide accurate information, or cooperate in the valuation of assets, the chancellor is entitled to proceed on the best information available."  *Stribling v. Stribling*, 906 So. 2d 863, 870 (¶25) (Miss. Ct. App. 2005).

¶73.   Keeping with precedent, "we refuse to hold [the chancellor] in error because of a party's failure to cooperate in providing the necessary documents for proper valuation." *Benton v. Benton*, 239 So. 3d 545, 548 (¶12) (Miss. Ct. App. 2018).  We find that "[i]n the absence of any other evidence, the chancellor proceeded on the best information available." *Pond*, 302 So. 3d at 1240 (¶14) (internal quotation mark omitted).  We therefore find no abuse of discretion.

¶74.   Furthermore, although Jason claims that the chancellor failed to consider evidence of an appraisal performed on the marital home that would have showed a higher value for the home, the trial transcript reflects that Jason did not offer an appraisal into evidence.  The record shows that the chancellor initially ordered an appraisal of the marital home as part of the December 20, 2017 temporary order.  When the chancellor discovered that no appraisal had been performed, the chancellor entered a pre-trial order that included instructions for Becky Ladd to perform an appraisal of the marital home.  This appraisal was admitted into evidence at trial.

¶75.   At trial, testimony reflected that Jason arranged for Scott McMurry to perform a

second appraisal of the marital home. According to Jason, Scott went to the marital home and measured the marital home to verify the square footage in Ladd's appraisal report. However, Scott did not perform a full appraisal. Jason explained that Scott performed a "limited inspection" of the house, but that Scott would need more information before he could do an appraisal report. The chancellor admitted Scott's sketches and measurements of the marital home into evidence for identification purposes only.

¶76. As stated, "the foundational step to make an equitable distribution of marital assets is to determine the value of those assets based on competent proof." *Williams*, 303 So. 3d at 833 (¶35). We find that the chancellor determined the value of the marital home based on the appraisal in the record, and we find no abuse of discretion.

## V. Alimony

¶77. Jason next argues that the chancellor erred by awarding Becky $350 per month in rehabilitative alimony for a period of twenty-four months. Jason asserts that the chancellor failed to make any findings as to why rehabilitative alimony was needed. Jason states that the chancellor's December 17, 2018 order defined rehabilitative alimony as "allowing expired educational credentials required for employment to be regained or new skills and qualifications to be obtained by a spouse who has not been recently active in employment outside the home." However, Jason argues that there is no connection between the purpose of rehabilitative alimony and the facts of this case, and he maintains that the evidence showed that Becky's employment remained constant. Jason also raised this issue in his post-

32

trial motion. Although the chancellor made adjustments to the total value of the marital estate and to the distribution of the marital estate in her amended judgment, the alimony award remained the same.

¶78. "The decision of whether to award alimony, and if so, what amount, is left to the chancellor's discretion." *Hearn v. Hearn*, 191 So. 3d 129, 132 (¶10) (Miss. Ct. App. 2016). This Court has explained that "[a]fter the marital property is equitably divided, the chancellor must consider whether the division, in light of the parties' nonmarital assets, will adequately provide for both parties; if so, then 'no more need be done.'" *Leblanc v. Leblanc*, 271 So. 3d 494, 504 (¶50) (Miss. Ct. App. 2018). We recognize that "alimony should be considered if the equitable division of marital property, together with any separate property, 'leaves a deficit for one party' . . . with respect to having sufficient resources and assets to meet his or her needs and living expenses." *Id*. In the event that "one party is left with a deficit, the chancery court must consider the *Armstrong* factors in determining whether to award alimony and the amount and type of the award." *Id*. at 505 (¶51).

¶79. In the present case, the chancellor considered the *Cheatham* factors and *Armstrong* factors and provided a thorough discussion of her analysis. In her analysis, the chancellor determined that although "[b]oth parties have more than adequate incomes and have insurance available to them[,] . . . Jason's income is currently greater than Becky's, and she is carrying a much greater share of the marital debt." The chancellor also recognized that "Becky cashed in her Alabama retirement when [the parties] moved from Alabama and said

33

funds were used for marital purposes." The chancellor stated that she had ordered Becky to refinance the marital home in her name alone, and the chancellor found that Becky "may need some additional financial security at least for a period of time to ensure that is possible." The chancellor ultimately awarded Becky the amount of $350 per month in rehabilitative alimony for twenty-four months.

¶80. Although rehabilitative alimony is generally awarded to "parties who have put their career on hold while taking care of the marital home," *Culumber v. Culumber*, 261 So. 3d 1142, 1152 (¶30) (Miss. Ct. App. 2018), this Court has also affirmed rehabilitative alimony awards in cases where "the less able party was already employed." *Brady v. Brady*, 14 So. 3d 823, 825 (¶9) (Miss. Ct. App. 2009) (citing *Wesson v. Wesson*, 818 So. 2d 1272, 1277-78 (¶10) (Miss. Ct. App. 2002)). Rehabilitative alimony can "enable [the less able party] to rehabilitate herself in order to maintain the standard of living she has become accustomed to or somewhere near it," especially when there is a disparity between the incomes of the parties. *Drumright v. Drumright*, 812 So. 2d 1021, 1028 (¶24) (Miss. Ct. App. 2001).

¶81. Here, the chancellor evaluated the award of alimony under the factors enumerated in *Armstrong* and *Cheatham*. In so doing, the chancellor found that "there is a disparity" between the incomes of Jason and Becky, explaining that not only does Jason have the greater income, but Becky bore the responsibility for the bulk of the marital debt. The chancellor accordingly awarded Becky rehabilitative alimony in the amount of $350 a month for a period of twenty-four months. After our review, we find that the chancellor was within

34

her discretion to award Becky rehabilitative alimony.

## VI.   Rule 59 Motion

¶82.   After the chancellor entered her December 17, 2018 opinion, Jason filed a timely motion for a new trial, or, in the alternative, to alter or amend the judgment, pursuant to Mississippi Rule of Civil Procedure 59, and to stay the judgment. In his motion, Jason asserted that the chancellor erred in her findings as to child custody, child support, equitable distribution of the marital estate, and alimony. Jason argued that the chancellor erred by denying his request for a continuance and by allowing Jason less than half of a day to present evidence and witnesses. Jason further claimed that he discovered "new evidence of Becky's attempts to tamper with the children's testimony," and he attached an email the parties' eldest child sent to Becky on December 17, 2018, the day the chancellor entered her order.

¶83.   After a hearing on Jason and Becky's post-trial motions, the chancellor entered her amended order, which granted in part and denied in part Jason's Rule 59 motion. The chancellor agreed that Jason's student loan debt should have been included in the marital estate. In the amended order, the chancellor included Jason's student loan debt, and she accordingly adjusted the total value of the marital estate. The chancellor also omitted the requirement for Jason to make a lump sum payment of $24,487.31 to Becky. Additionally, the chancellor allocated the Highlander vehicle (which the chancellor initially had allocated to Becky) to Jason.

¶84.   As stated, Jason's notice of appeal provides that he is appealing from the June 5, 2020

35

amended final order as well as the June 18, 2020 order amending the final order. Although Jason's appellate brief asserts that the chancellor erred by failing to grant some of the relief requested in his Rule 59 motion, Jason does not provide any authority or argument regarding a chancellor's grant or denial of a Rule 59 motion. Mississippi Rule of Appellate Procedure 28(a)(7) requires that the argument section of an appellant's brief "contain the contentions of appellant with respect to the issues presented, and the reasons for those contentions, with citations to the authorities, statutes, and parts of the record relied on." M.R.A.P. 28(a)(7).

¶85. We have consistently held that the "[f]ailure to cite any authority is a procedural bar, and [a reviewing court] is under no obligation to consider the assignment." *Taylor v. Kennedy*, 914 So. 2d 1260, 1262 (¶4) (Miss. Ct. App. 2005); *see also Jefferson v. State*, 138 So. 3d 263, 265 (¶9) (Miss. Ct. App. 2014) (holding that "[t]he appellant must affirmatively demonstrate error in the court below, and failure to do so waives an issue on appeal"). Because Jason has failed to supply any legal authority on this issue, we decline to address this assignment of error. Despite the procedural bar on this particular issue, many of the issues raised in Jason's Rule 59 motion have been addressed above.

## CONCLUSION

¶86. We find that the chancellor's judgment is supported by substantial evidence, and we affirm.

¶87. **AFFIRMED.**

**GREENLEE, WESTBROOKS AND McDONALD, JJ., CONCUR. BARNES, C.J., AND McCARTY, J., CONCUR IN PART AND IN THE RESULT WITHOUT**

36

**SEPARATE WRITTEN OPINION. WILSON, P.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY EMFINGER, J.; McCARTY, J., JOINS IN PART. LAWRENCE AND SMITH, JJ., NOT PARTICIPATING.**

**WILSON, P.J., CONCURRING IN PART AND DISSENTING IN PART:**

¶88. I concur that the chancellor did not abuse her discretion in dividing the marital estate, awarding alimony, or setting child support. However, I respectfully dissent in part because the case should be reversed and remanded on the issue of custody. For the reasons explained below, the chancellor erred by refusing to allow the parties' fifteen-year-old son to testify, by excluding the testimony of the parties' ten-year-old son simply because this is a divorce case, and by refusing to allow the court reporter to be present for the in camera interview of the children. In addition, the chancellor abused her discretion by preventing Jason from cross-examining Becky about prior alleged affairs—and then penalizing Jason for allegedly having had more affairs than Becky. These errors seriously impacted Jason's ability to present his case for custody under *Albright* and require a new trial.

> **I.** **The chancellor erred by (a) refusing to allow the parties' fifteen-year-old son to testify, (b) excluding the testimony of the parties' ten-year-old son simply because this is a divorce case, and (c) refusing to allow the court reporter to be present for the in camera interview of the children.**

¶89. In *Powell v. Powell*, 198 Miss. 301, 22 So. 2d 160 (1945), the Mississippi Supreme Court recognized that there had developed a general "rule against permitting children *of tender years* to testify in a divorce proceeding between their parents," but the Court held that general rule "ha[d] no application to a child as far advanced in years as the witness" in that

37

case—the parties' son, who was fifteen-and-a-half years old. *Id.* at 303, 22 So. 2d at 160 (emphasis added). The Court then held that the chancellor committed reversible error by refusing to allow the witness to testify. *Id.*

¶90.  In *Jethrow v. Jethrow*, 571 So. 2d 270 (Miss. 1990), the Mississippi Supreme Court stated that *Powell*'s reference to a general "rule against permitting children *of tender years* to testify in a divorce proceeding between their parents" was not based on any prior decision of the Court but rather "simply recognized a well known chancery court rule and custom in divorce cases." *Id.* at 272-73 (emphasis added). In addition, that general rule regarding "children of tender years" "had no application in the facts of [*Powell*]," which involved the testimony of a fifteen-year-old. *Id.* at 273.

¶91.  In *Jethrow*, a case in which a party attempted to call her eight-year-old child as a witness, *id.* at 271, the Court held more broadly "that there can be no per se prohibition against a child witness testifying in a divorce case between his parents." *Id.* at 273. The Court explained that "[t]he right of every litigant to compulsory process for witnesses and have them testify under oath in court is so well grounded that any per se exclusion simply because he or she is a child of the divorcing parents risks offending the due process provisions of . . . the U.S. Constitution[] and . . . the Mississippi Constitution." *Id.* The Court then set forth certain "minimum" procedural requirements that a chancellor should follow "before excluding the testimony of a child witness *of tender years* in a divorce proceeding." *Id.* (emphasis added). The Court stated that while a chancellor has "a certain

amount of discretion," the chancellor "should not . . . reject outright proposed testimony of a child in custody proceedings, where the omission of such crucial testimony might be harmful to the child's bests interests." *Id.* (quoting *Crownover v. Crownover*, 337 N.E.2d 56, 59 (Ill. App. Ct. 1975)). Rather, a chancellor should, at minimum, interview the child in camera, and "the testimony of a child called as a witness in a divorce case should not be excluded for reasons other than competency or evidentiary defects or for the protection of the child." *Id.* at 274 (quoting *Crownover*, 337 N.E.2d at 59). In *Jethrow*, the Court held that the chancellor committed reversible error "in excluding [the parties'] child's testimony simply because this was a divorce proceeding." *Id.* at 271.

¶92. In *Robison v. Lanford*, 841 So. 2d 1119 (Miss. 2003), the Mississippi Supreme Court added to the *Jethrow* procedure by holding that "a record of in-chambers interviews with children [in custody cases] *must* be made and become a part of the record." *Id.* at 1125 (¶21) (emphasis added). The Court "set forth the following procedure to be employed by courts dealing with in-chambers interviews of children": "[a] record *must* be made by a court reporter physically present during the in-chambers interview." *Id.* (emphasis added). The Court recognized "that a child may be uncomfortable in an in-chambers interview with even one adult, and that discomfort might be exacerbated by the presence of a second adult with the attendant equipment of a court reporter." *Id.* But the Court stated that it was "confident that the chancellors in our state will be able provide an atmosphere in which the child is able to converse freely with the chancellor, without attention being drawn to the reporter." *Id.*

In *Robison*, the Court reversed based on the chancellor's failure to have a court reporter present during her in camera interview of the parties' child, and the Court remanded with instructions that any in camera conversations with the child "must be held with a court reporter present to record the in-chambers proceedings." *Id.* at 1126 (¶25).

¶93. In this case, Jason attempted to call the parties' sons as witnesses. He asked that, at minimum, the two oldest sons—then-fifteen-year-old "P.S." and then-ten-year-old "P.J."—testify in camera and on the record. The chancellor denied Jason's request without first interviewing any of the children in camera. She simply stated that it was not in their best interest to testify. The chancellor stated that she would talk to the children in camera but that a court reporter would not be present and that the parties' attorneys would not be allowed to ask any questions. The chancellor's ruling appears to have been based on a general rule against allowing children to testify in divorce cases. The chancellor stated:

> Everybody who has practiced before me knows how I interview children in divorces. You can go ahead on the record and cite your case law . . . and then I will tell you what I'm going to do and why. Because there's no way in the world that I'm going to have a record of children testifying in a divorce action that they will have access to in 15 to 20 years from now, it is not going to happen.

Jason's attorney then cited *Robison*, *supra*, but to no avail.

¶94. The chancellor's ruling in this case was inconsistent with the Supreme Court's holdings in *Powell*, *Jethrow*, and *Robison*. Under *Powell*, Jason's right to call P.S. as a witness was not subject to the chancellor's discretion. *Powell*, 198 Miss. at 303, 22 So. 2d at 160. The chancellor's discretion to exclude the testimony of "children of tender years"

40

simply has "no application" to fifteen-year-old P.S. *Id.*; *Jethrow*, 571 So. 2d at 272-73. In addition, under *Jethrow*, the chancellor erred by excluding ten-year-old P.J.'s testimony simply because this was a divorce case and prior to conducting an in camera interview. *Jethrow*, 571 So. 2d at 271-74. Finally, under *Robison*, the chancellor erred by refusing to make a record of her in camera interview with the children. *Robison*, 841 So. 2d at 1125 (¶21). The Supreme Court's opinion in *Robison* makes clear that a chancellor has no discretion to refuse to make a record of such an interview and that "[a] record *must* be made by a court reporter physically present during the in-chambers interview." *Id.* (emphasis added). In this case, however, the chancellor was adamant that there would be no record of the interviews.[6] Consistent with *Powell*, *Jethrow*, and *Robison*, these errors require reversal and remand for a new trial.

¶95. The majority argues that the chancellor did not automatically exclude the children's testimony but did so only because the divorce was "contentious." *Ante* at ¶43. However, there is nothing in the record to support this claim. As quoted above, the chancellor told Jason's attorney that she could "go ahead on the record and cite [her] case law," but there was "no way in the world that [the chancellor was] going to have a record of children testifying in a divorce action." Contrary to *Jethrow*, the chancellor ruled before she ever spoke to the children in camera and for reasons that had nothing to do with this particular

---

[6] To the extent that the chancellor was concerned about the children having "access to" their testimony in the future, the Supreme Court made clear in *Robison* that "[i]t will be at the court's discretion whether to seal the interview." *Robison*, 841 So. 2d at 1125 (¶21).

case. Moreover, the Supreme Court's holdings in *Powell*, *Jethrow*, and *Robison* apply to "contentious" custody disputes too—not just amicable custody disputes.

¶96. The majority also argues that Jason waived this issue by not making a proffer.[7] I disagree for at least four reasons.

¶97. *First*, the whole point of the Supreme Court's decisions in *Jethrow* and *Robison* is to *require* the chancellor, upon request, to conduct an on-the-record in camera interview before excluding the testimony of a child in a custody case. In other words, the Supreme Court has placed the obligation on *the chancellor* to make an adequate record before excluding such testimony. The reason the record in this case is woefully inadequate is not that Jason did not make a proffer but rather that the chancellor failed to comply with the clear holdings of *Jethrow* and *Robison*. Indeed, in *Robison* the Supreme Court held that the chancellor committed reversible error even though the parties had expressly agreed to allow the chancellor to interview their daughter in camera and off the record. *Robison*, 841 So. 2d at 1123 (¶13). The Supreme Court stated that while such a "stipulation would ordinarily waive any objection to the lack of a record, . . . the need for a record to enable meaningful appellate review outweigh[ed] any need to find waiver." *Id.* In this case, Jason clearly preserved the issue for appeal by specifically and timely objecting to both the exclusion of his sons' testimony and the chancellor's refusal to make a record of her interviews with them.

¶98. *Second*, the significance of the children's testimony was evident. In this contested

---

[7] Becky does not make this argument.

42

custody case, fifteen-year-old P.S. had expressed a preference for his parents to share joint physical custody—as they had for a year under the court's temporary order. The reasons for P.S.'s preference are obviously relevant and important to the custody decision, and his testimony should not have been excluded automatically. Yet, because the chancellor failed to follow *Powell*, *Jethrow*, and *Robison*, there is nothing in the record on the subject.

¶99. *Third*, Jason's ability to make a proffer was limited because the chancellor had "specifically enjoined and ordered" the parties not to discuss any "issues surrounding the issues contained in the divorce, including custody, with their children." Thus, the children were not the type of witnesses whose testimony Jason could have proffered based on pretrial interviews or discovery. Jason's attorney did the best she could under the circumstances.

¶100. *Fourth*, Jason's attorney argued to the chancellor that the sons' testimony was important because the GAL's five-page report lacked detail and failed to set out sufficient facts to support or explain her custody recommendation. Counsel argued that Jason was entitled to use his sons' testimony to show that the GAL's report was flawed and that joint physical custody was in his sons' best interest.

¶101. The majority makes a final argument that the chancellor's failure to make a record was only "harmless error" on the "particular facts" of this case. *Ante* at ¶47. The majority thinks the error was harmless because the GAL testified about P.S.'s preference and because the chancellor conducted an unreviewable off-the-record interview of the children. In truth, the "particular facts" of this case show that the error was anything but "harmless." The GAL's

43

report did state that P.S. expressed a preference for joint physical custody and wanted to spend alternating weeks with his mother and father, but the report did not provide any detail regarding P.S.'s reasons. In her testimony, the GAL read from a text message that P.S. had sent to Becky in which P.S. stated that he wanted Becky and Jason to share "50/50" joint physical custody of all three children because his two younger brothers "need[ed] both of their parents in their life." However, the chancellor interjected sua sponte to opine that the message did not sound like it was composed by a fifteen-year-old. The GAL testified that P.S. told her that he had indeed composed the message, but the chancellor continued to express her doubts.[8] In addition, Becky's attorney later suggested—without any apparent

---

[8] In response to the chancellor's interjection, Jason, who was pro se at the time, stated, "I would ask that to be a question for [P.S.], Your Honor." This prompted the following exchange:

| | |
|---|---|
| THE COURT: | You are not talking to me, I hope. I hope you are talking to the [GAL]. |
| MR. DENHAM: | Well, I was talking to you on that. I mean, I would say if -- |
| THE COURT: | You are telling me who I need to question? |
| MR. DENHAM: | No. I'm just saying if that is a question, I would hope that [P.S.] would be the answer to it [sic] not me and not -- |
| THE COURT: | No. I think you're telling me what you think I ought to do. |
| MR. DENHAM: | I'm sorry. |
| THE COURT: | I have been doing this for 38 years, I think I know what I have to do. Let's just get this -- it is just the Court is not accustomed to hearing a 15-year-old saying you-all are going to do what I say you are going to do, that's like an adult talking. . . . . |

support in the record—that P.S.'s preference "may have changed." And the chancellor's final *Albright* analysis completely failed to acknowledge or address P.S.'s preference for joint physical custody. Instead, the chancellor avoided the issue altogether by stating obliquely that P.S. "did not indicate a preference to live with one parent or the other." Given the chancellor's failure to address P.S.'s expressed preference for joint physical custody, the importance of the children's testimony, and our inability to review the chancellor's in camera interview, we cannot possibly say with confidence that the chancellor committed only "harmless error" by failing to follow clear Supreme Court precedent.

**II.      The chancellor abused her discretion by (a) limiting Jason's ability to present evidence relevant to *Albright*'s "moral fitness" factor and (b) then penalizing him for failing to produce such evidence.**

¶102.   In making an initial custody decision, the "chancellor[] must consider the [*Albright*] factors" and must make findings regarding "each of the *Albright* factors that is applicable to the case before her." *Blakely v. Blakely*, 88 So. 3d 798, 803 (¶¶16-17) (Miss. Ct. App. 2012). The "moral fitness of [the] parents" is one of the *Albright* factors. *Id.* at (¶16). Indeed, the "[m]oral fitness of each parent is an important factor to consider." *Jerome v. Stroud*, 689 So. 2d 755, 758 (Miss. 1997); *see also Borden v. Borden*, 167 So. 3d 238, 242 (¶6) (Miss. 2014) (stating that although "it is only one of the *Albright* factors," "moral fitness is clearly an important factor"); *Carr v. Carr*, 480 So. 2d 1120, 1123 (Miss. 1985) (stating that although "moral fitness is but one factor to be considered," "it is a factor worthy of weight in determining the best interest of the child"). The Supreme Court has also stated that although

45

"marital fault should not be used as a sanction in custody awards," *Albright*'s moral fitness

factor "encompasses" a parent's adulterous conduct. *Carr*, 480 So. 2d at 1123. In other

words, evidence of adultery is relevant to the *Albright* analysis.

¶103. In her final custody decision in this case, the chancellor recognized that evidence of

adultery was relevant under *Albright*. In her ruling, the chancellor stated,

> Although both parties admit to infidelity during the marriage, Becky's
> consisted of a single one-night stand several years ago, after which the parties
> reconciled, while Jason has been involved in numerous sexual trysts, including
> those that ultimately caused the demise of the marriage. The Court also heard
> testimony regarding Jason's use of pornography and online dating websites.
> This factor favors Becky.

¶104. The problem with the chancellor's ruling is that during trial she limited Jason's ability

to present evidence relevant to this issue. On cross-examination, after Becky admitted that

she had a "one-night stand" years earlier, Jason's attorney asked whether she "ever had more

than a professional relationship with one of [her] co-workers." Becky's attorney objected

on the ground that Jason had not filed any "pleadings seeking any affirmative relief on the

grounds of adultery or anything else." Jason's attorney responded that the question was

relevant because it went "to the question of moral fitness" under *Albright*. Jason's attorney

further argued that "the guardian ad litem's report referenced Jason's affairs throughout the

marriage in connection with her analysis of moral fitness" but made "no reference to any of

the facts about Becky's [alleged affairs]." However, the chancellor sustained the objection.

She stated that the question was not "relevant" because Jason "did not affirmatively plead

condonation of his affairs or the fact that [Becky] has had affairs." The chancellor also stated

46

that she had already heard Becky's "admission . . . regarding one affair."

¶105.   The majority affirms the chancellor's ruling, holding that the question was "outside the scope of the pleadings" because "Jason did not plead the defense of condonation." However, as Jason's attorney attempted to explain at trial, Jason was not attempting to assert a "defense" of "condonation" but only wanted to develop evidence relevant to *Albright*'s moral fitness factor.  A party is not required to "plead" each and every fact that may be relevant to an *Albright* analysis.  Thus, the chancellor erred by sustaining Becky's objection to the question as beyond the scope of the pleadings.  Moreover, after refusing to allow Jason to cross-examine Becky regarding additional alleged affairs, the chancellor compounded the error by finding that the moral fitness factor favored Becky because she had engaged in adultery fewer times than Jason.

¶106.   The majority argues that Jason failed to preserve this issue because he did not make a proffer of what Becky's testimony would have been if he had been allowed a full cross-examination.[9]  However, the Mississippi Supreme Court has "held on several . . . occasions" that when "a party is improperly denied cross-examination, he is not required to make the proffer of the witness'[s] testimony such as would otherwise be required." *Suan v. State*, 511 So. 2d 144, 147 (Miss. 1987) (collecting cases); *accord Nalls v. State*, 651 So. 2d 1074, 1076 (Miss. 1995).  Indeed, the Supreme Court has stated that a proffer is not required when a party is improperly prohibited from cross-examining an adverse witness because "[a]s a

---

[9] Becky does not make this argument.

matter of common sense, the party would seldom know precisely what cross-examination would reveal." *Harris v. Buxton T.V. Inc.*, 460 So. 2d 828, 833-34 (Miss. 1984); *see also* M.R.E. 103 advisory committee note (stating that the adoption of Rule 103 "does not affect [*Harris*'s] holding"); *Valentine v. State*, 396 So. 2d 15, 17 (Miss. 1981) ("No one can anticipate or make precise proffer of what he may develop by employing the important right of cross-examination."). In addition, it is apparent from context that Jason believed that Becky had engaged in additional adulterous affairs and intended to cross-examine her on that subject. Under the circumstances, no further proffer was necessary. M.R.E. 103(a)(2).

¶107. The majority also asserts that Jason was not prejudiced because he was allowed to testify that he "believe[d]" that Becky had engaged in additional affairs. However, Jason's own testimony about what he believed was hardly an adequate substitute for his right to cross-examine Becky under oath. Indeed, given that the chancellor did not credit Jason's testimony, it did nothing to mitigate the prejudice flowing from the improper limitation of his right of cross-examination. Put simply, the chancellor erred by prohibiting Jason from cross-examining Becky about adultery and then penalizing Jason for (allegedly) engaging in adultery more times than Becky.

## CONCLUSION

¶108. Based on the errors discussed above, I would reverse and remand for a new trial on custody. Therefore, I respectfully dissent with respect to the issue of custody.

**EMFINGER, J., JOINS THIS OPINION. McCARTY, J., JOINS THIS OPINION IN PART.**

48